GEYER, CORNELL & NEWELL, INC., PETITIONER, ET AL.,[1] *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1019, 1185, 1186, 1187, 1188.

Promulgated January 23, 1946.

*Richard F. Barrett, Esq.,* for the petitioners.
*Harold D. Thomas, Esq.,* for the respondent.

---

[1] Proceedings of the following petitioners are embraced in this report: Mary A. Geyer, Mercedes G. Geyer, Bertram B. Geyer, and The Geyer Company.

OPINION.

MURDOCK, *Judge*: The only issue for decision in the case of Geyer is whether it realized income in 1940 of $48,942.88, an amount which appeared on its books as a reserve for bad debts. The Commissioner has held and contends that this amount, having been deducted from income in prior years, must be restored to income for 1940 because the need for the reserve ceased in that year. The amount in question was built up through additions to the reserve which were deducted from income in years prior to 1934. A reserve consists of entries upon books of account. It is neither an asset nor a liability. It has no existence except upon the books, and, unlike an asset or a liability, it can not be transferred to any other entity. Reserves are set up for various business purposes. They offset assets, either specifically or generally. Not all reserves are recognized for income tax purposes. The only one mentioned in section 23 of the Internal Revenue Code is one for bad debts. A reserve for bad debts is in recognition of the fact that an asset, accounts receivable, may not be collected in full. Any balance in such a reserve has no further purpose after all of the accounts, against which it was set up, have been collected. The account then has no meaning and should be closed. Since it served to offset assets, it is closed by carrying the balance to some other account, such as profit and loss or surplus, which likewise offsets assets. Such a balance, when no longer needed, is "treated as" income where it was built up by additions which were allowed as deductions from income of prior years. It has been held, as both sides agree, that any balance in a reserve for bad debts is properly to be restored to income of the year in which the need for maintaining the reserve ceases. *North American Coal Corporation*, 32 B. T. A. 535; affd., 97 Fed. (2d) 325; *Peabody Coal Co.*, 18 B. T. A. 1081; affd., 55 Fed. (2d) 7;. certiorari denied, 287 U. S. 605; *Rossin & Sons, Inc.* v. *Commissioner*, 113 Fed. (2d) 652, reversing 40 B. T. A. 1274; *G. M. Standifer Construction Corporation*, 30 B. T. A. 184.

The Commissioner argues that the need for this reserve ceased in 1940, while the petitioners contend that it ceased prior to that year. The evidence shows that the petitioners are right. The reserve was set up prior to 1934 solely for the purpose of covering accounts receivable due from the clients of Geyer while it was engaged in the advertising business. Geyer, in 1935, permanently discontinued its

advertising business and collected all of its accounts receivable from clients except for $61.58. The account for $61.58 was closed in 1938. Thus, the balance in the reserve should have been restored to income long prior to 1940.

The president of Geyer and G. C. N. were debtors of Geyer after 1935. The respondent concedes that the amount owed by its president can not be regarded as justification for continuing the reserve, but he seems to think that the amount due from G. C. N. might justify the reserve after 1935. The reserve was almost as large as this debt in 1935. The evidence is clear that the reserve never related to any amount due from G. C. N. and can not be supported upon that basis any more than on the basis of the loan to the president. Neither could its restoration to income be deferred upon the theory that it was a reserve for Geyer's contingent liability upon its guarantee of the liability of G. C. N. to publishers in connection with the advertising business conducted by G. C. N. Such a reserve, no matter how prudent, is not recognized for Federal income tax purposes and does not prevent immediate restoration of a reserve to income. *El Dorado Oil Works*, 46 B. T. A. 994; *Brown* v. *Helvering*, 291 U. S. 193, affirming 22 B. T. A. 678, and 63 Fed. (2d) 66; *Peabody Coal Co., supra*. The respondent infers that Geyer should be estopped in some way from resisting the addition of this amount to income for 1940. No such issue has been pleaded. *Helvering* v. *Brooklyn City R. Co.*, 72 Fed. (2d) 274, affirming 27 B. T. A. 77. The evidence shows that the respondent has been adequately informed at all times of the circumstances and it fails to show a proper basis for estoppel or anything akin to estoppel. *Tide Water Oil Co.*, 29 B. T. A. 1208; *El Dorado Oil Works, supra*. The Commissioner erred in adding the $48,942.88 to Geyer's income for 1940. This makes unnecessary discussion of other arguments advanced as to this issue by the petitioners and a concession by the respondent.

The Commissioner argues briefly that, if the amount is not income in 1940 to Geyer, it was income of G. C. N. for that same year. This argument seems to be that income of G. C. N. resulted from the fact that one of the assets of Geyer transferred in 1940 to G. C. N. was a debt due to Geyer from G. C. N. offset by this reserve. He frankly states that he does not think the argument is sound, and we agree. The reserve was not related to the G. C. N. debt and did not affect it in the transfer. It did not benefit G. C. N. in any way. The Commissioner erred as to this item.

The principal question in the case of G. C. N. is whether it is entitled to a deduction of $65,742.57, representing abnormal income of 1940 attributable to other years, in computing its excess profits tax. It contends that its income from advertising Nash automobiles is a "class"

of income within the meaning and intendment of the definition of abnormal income in section 721 (a) (1), $65,742.26 thereof was "net abnormal income" within (a) (3), and that amount is attributable to other years under (b). The Commissioner, in determining the deficiency, allowed no deduction of this kind.

Abnormal income is defined in section 721 (a) (1) to include income of any class includible in the gross income of the taxpayer "if the taxpayer normally derives income of such class, but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years." Congress mentioned a few classes of income in 721 (a) (2), none of which is like the income here in question, and then provided that the classification of other income shall be subject to regulations to be prescribed by the Commissioner. Section 30.721-2 of Regulations 109, as amended by T. D. 5045, C. B. 1941-1, pp. 69, 86, provides that other income may be grouped by the taxpayer, subject to the approval of the Commissioner, in such other classes as are reasonable in the business and as are appropriate in the light of the taxpayer's business experience and accounting practice.

The following excerpts are from Committee on Ways and Means Report No. 146, 77th Congress, 1st session, pp. 1-3, on the Excess Profits Tax Amendments of 1941:

\* \* \* These purposes [of the excess profits tax provisions of the Second Revenue Act of 1940] were, first, to provide additional revenue urgently needed to help meet the costs of the national-defense program, and second, to prevent the rearmament program from furnishing an opportunity for the creation of new war millionaires or the further substantial enrichment of already wealthy persons.

In view of these compelling motives, the provisions of that act lay a tax upon that portion of the earnings of corporations determined to be excess profits. The tax rates provided, or even higher rates, are thoroughly justified if the income subject thereto is clearly of the type intended to be reached. At the same time, equitable considerations demand that every reasonable precaution be taken to prevent unfair application of the tax in abnormal cases. The weight of the burden imposed carries with it a commensurate need for restricting its application to the cases for which it was designed.

\*    \*    \*    \*    \*    \*    \*

Experience with excess-profits taxes, both in the United States and abroad, has demonstrated conclusively that relief in abnormal cases cannot be predicated on specific instances foreseeable at any time. The unusual cases that are certain to arise are so diverse in character and unpredictable that relief provisions couched in other than general and flexible terms are certain to prove inadequate.

For these reasons, the present legislation attempts to provide, both by specific terms and in carefully guarded general terms, a set of flexible rules which should alleviate at least the bulk of the severe hardship cases which may arise. The success or failure of legislation of this type depends, to a considerable degree, upon its intelligent and sympathetic administration. Through its confidence in the experience and ability of the officials of the Treasury Department and the Bu-

reau of Internal Revenue, your committee recommend the present flexible and broad legislation as the most satisfactory method of meeting the contingencies that will arise.

The evidence shows that the services furnished by the petitioner in advertising one commodity were different from those which it furnished in advertising another. E. R. Squibb & Son, for which G. C. N. advertised drugs, obtained from G. C. N. services which differed from those obtained by Nash for its automobiles. The Nash-Kelvinator advertising differed from the Nash motors advertising. Perhaps separate classification of the income from every one of the separate accounts of G. C. N. is proper for the purpose of section 721 (a) (1). There is little to guide the Commissioner or this Court in deciding such a question. Although no valid objection to such separate classification occurs to us, nevertheless, we refrain from deciding the question at this time. We shall assume for the purpose of further discussion herein that the automobile advertising income is a separate class within the meaning of section 721 (a) (1).

The gross income of this class for 1940 was in excess of 125 per centum of the average of this class of income for the four preceding years. This results principally from the fact that 1940 was the best year for this account, and, since the account was not obtained until some time in 1937, there was no 1936 income of this class to support the average. Thus, it appears from the mathematics prescribed in the law, that the petitioner had "abnormal income" from this source and the "net abnormal income" amounted to $65,742.26. This necessarily follows, once the automobile income is recognized as a separate class. We can not learn from the legislative history of the law nor can we imagine any reason why Congress would want to relieve this income of this petitioner from the excess profits tax. It was not abnormal in any ordinary sense of that word. It was just the result of a good year in a relatively new account. Nevertheless, Congress has given a rigid definition of abnormal income and this comes within it, once the classifications is accepted.

However, the taxpayer gets no deduction unless the net abnormal income or some part of it is properly attributable to other years under section 721 (b). That paragraph merely provides that the amount of the net abnormal income to be attributed to other years is to be determined under regulations prescribed by the Commissioner. The regulation (Regulations 109, art. 30.721-3) provides, among other things, that "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events"; to the extent that the net abnormal income is the result of increased volume of sales due to increased demand for the product, they shall not be

allocated to other years; and "Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 per centum of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions." This increased income for 1940 resulted, so far as we can judge from the record, solely from increased sales due to a greater demand upon the part of Nash and solely from an improvement in business conditions. There is no hardship here. The Commissioner has not allowed any deduction. His determination is well within his regulation.

The petitioner suggests that guidance can be obtained from section 30.721–8 of the regulations, which provides that income within section 721 (a) (2) (C) "is to be attributed to the taxable years during which expenditures were made for the particular exploration, discovery, prospecting, research, or development which resulted in such item being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures." The petitioner points out that expenditures on the advertising for the 1940 model began in April 1939, and about 75 percent of those expenditures on either a time or dollar basis was incurred during 1939. It argues from this fact that 75 percent of the income from advertising the 1940 model should be allocated to 1939. Seventy-five percent of the income from advertising the 1940 model amounted to $212,500.77, whereas only $105,708.27 of that income was actually accrued as 1939 income. It then argues that the difference between these two figures, or $106,792.50, should be shifted from 1940 to 1939 so that income and deductions may be matched and income clearly reflected. It recognizes, however, that this shift must be limited to $65,742.26 because that is the maximum amount of net abnormal income which may be attributed to other years under section 721.

It should be remembered, however, that the "net abnormal income" in question does not relate to the income from advertising the 1940 model, but relates to the income of the calendar year 1940 which includes a part of the income from advertising the 1940 model and also a part of the income from advertising the 1941 model. The petitioner also suggests that it might be entitled to a similar shift of income under sections 42 and 43 in order to reflect income clearly. This latter suggestion serves to draw greater attention to the obvious fallacy in the petitioner's entire theory of allocation. If some income of 1940 should be shifted to 1939 because some of the expenses of earning that income were incurred in 1939, then a similar shift of 1941 income to 1940 would have to be made for exactly the same reason in order to avoid a distortion of income for 1939. A distortion would always result in such a case if parallel treatment were not adopted as to both ends of each year. The reasons for making the one shift would apply equally to the other.

The above principles also apply for excess profits tax purposes. The petitioner's excess profits tax net income for 1940, which includes some income from the 1940 model and also some income from the 1941 model, is determined after deducting all expenses incurred in 1940. Those expenses include a large percentage of the total expenses incident to the 1941 model. Section 721 does not provide for shifting some 1941 income to 1940 or for shifting some 1940 expenses to 1941, one of which shifts would be necessary to avoid a gross disproportion under the petitioner's theory. That theory is based upon a regulation applicable to a kind of abnormal income which is not involved in this case. It could be applied year after year so that some income would never be subject to tax. It would give benefits not intended. No issue is raised under sections 42 and 43 and the petitioner's accounting methods seem adequate and satisfactory to it.

The administration of section 721, under which the Commissioner has denied this deduction, was not unintelligent, unsympathetic, or arbitrary, but, in the light of all events, was well within the flexible rules laid down for his guidance and within regulations, reasonable at least for this particular kind of a case.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*