## R. GSELL & CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69106.   Filed April 13, 1960.

*Francis J. Rogers, Esq.,* for the petitioner.
*Charles B. Markham, Esq.,* for the respondent.

48

**OPINION.**

Respondent determined petitioner was availed of in the years 1947 through 1950, and 1952, to prevent the imposition of surtax upon its shareholders, by accumulating, rather than dividing or distributing, its earnings and profits, all within the meaning of section 102 of the Internal Revenue Code of 1939.[1]

As provided by the statute, an accumulation of earnings or profits beyond reasonable business needs is indicative of a purpose to avoid the shareholder surtax, unless the contrary be established by a clear preponderance of the evidence. In the final analysis however, reasonableness of the accumulation is merely a subsidiary consideration, the ultimate question being whether the taxpayer was availed of for

---

[1] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax * * *

    *      *      *      *      *      *      *

(c) EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

the purpose proscribed by the statute. *Young Motor Co.*, 32 T.C. 1336 (1959), on appeal (C.A. 1). Thus, it may well be that a taxpayer was not availed of to avoid the surtax during a particular year, even though the accumulation in that year was clearly beyond reasonable business needs. *Gus Blass Co.*, 9 T.C. 15 (1947).

Whether the accumulations challenged here were consonant with reasonable business needs is a question of fact, to be decided on the basis of sound business management, not in a theoretical vacuum. The measure of reasonableness is the business need which exists at the time of the accumulation. Proceeding on a year-by-year basis, we turn to the case at hand.

Petitioner's gross sales and net pre-tax profit for 1947 were at an alltime high. Unquestionably, it was riding the crest of a post-war business boom. It had just concluded its eighth successive year of net pre-tax profits and the fourth consecutive year wherein it could boast an unimpaired surplus. In March of 1948, its chairman considered retiring its preferred stock, a clear indication of its economic prosperity. Apparently the only reason this step was not taken was the chairman's extremely conservative nature; a nature born of years of financial vicissitudes. Albeit petitioner's past had not been without hardship, *as of December 31, 1947*, its future was bright. In fact, it now would justify the 1947 accumulation on the grounds that it expected the boom to continue throughout 1948, thus generating a need for the funds; i.e., to finance the increase in inventory and receivables which would be occasioned by the additional business.

As of the close of 1947, undivided earnings and profits (not including those accumulated during the year) were at a 25-year peak of $71,128. Current assets exceeded current liabilities by a ratio of 5 to 1 ($347,988/$62,006). Its assets included cash of $44,381, short-term investments of $35,227, receivables of $185,409, and inventory of $72,717. Some $33,000 of those receivables represented commissions due from Swiss factories, amounts ordinarily paid within 4 months after they were earned. The balance of its receivables were accounts liquidated within a 6-month period. Of its total yearend inventory, $32,000 represented completed watches. In light of these facts, and what appears to have been a steady turnover in inventory, petitioner's argument that its receivables and inventory should not be included among its current assets is untenable.

Petitioner further argues that the expenditures it was to make during 1948 on its purchases and customs duty represented yearend liabilities at the close of 1947, and should have been taken into account in judging its business needs as of that time. True, petitioner had very little advance notice of the delivery date of a shipment of Swiss merchandise. It is also evident that immediate payment

was required in order to obtain the highly desired discount. However, petitioner's argument assumes its entire outstanding orders would be delivered in a single shipment, an event which as a practical matter and based on past experience would never take place. As it was, orders were lagging far behind in shipment, a fact of great concern to the petitioner. Moreover, its average monthly expenditure during 1948 for the expenses of manufacturing, all purchases, shop salaries, and customs duty was only $30,000. This fact, when coupled with its total monthly cash expenditures for all purchases during 1948 (which reached a high of $95,600 in June and a low of $18,800 in February), clearly indicates the gradual manner in which its orders were being shipped. Finally, it is significant to note that petitioner itself chose not to record these commitments on its books as liabilities. On the basis of these facts, we believe it was reasonable to assume, at the close of 1947, that these outstanding commitments would, in the normal course of events, be met out of current assets as well as anticipated 1948 business.

After a careful consideration of these and other facts of record, each of which has been affirmatively shown, we have concluded and have found as a fact that petitioner's accumulation of $47,953.58 in 1947 was beyond its reasonable business needs.

Much the same applies to the remaining years in issue. The ratio of petitioner's current assets to its current liabilities rose to 12 to 1 by the close of 1948; 20 to 1 by the end of both 1949 and 1950. As 1952 came to a close, that ratio stood at 17 to 1. Its cash and investments totaled $85,436 as of December 31, 1948, $94,117 at the end of 1949, $154,704 at the close of 1950, and $286,053 at December 31, 1952. Throughout each of these years its undivided earnings and profits increased steadily, reaching $116,108 at December 31, 1947, $136,139 at December 31, 1948, $145,113 at December 31, 1949, and $158,047 at December 31, 1951. Though a noticeable decrease in gross sales occurred during 1948, 1949, and 1950, it was accompanied by a corresponding decrease in operating and merchandise expenses. Finally, the decrease in merchandising income was offset, in part, by an increase in commission income.

Thus, consistent with our reasoning as to the year 1947, we have concluded and have found as a fact that petitioner's 1948 accumulation of $20,250.23, its 1949 accumulation of $19,615.96, its 1950 accumulation of $11,703.78, and its 1952 accumulation of $17,287.56 were beyond its reasonable business needs.

In reaching this conclusion we have carefully examined petitioner's contention that the years 1948 through 1952 were beset by a recessed economy, bringing about uncertainty insofar as its future was concerned. Militating strongly against this argument is the fact that,

even in the midst of a recession, it still managed to make a profit. Perhaps the explanation for this lies in the fact that it was able to curtail its costs in the face of declining sales. Whatever may have been the reason, petitioner consistently closed out each of the years under consideration with an overall profit. While its chairman may have viewed cautiously the decline in merchandising income, he continually expressed satisfaction in the improvement of the commission department. Whichever department contributed to its success, petitioner was able to accumulate earnings and profits. Thus, we cannot give much weight to its claim that "uncertain and adverse business conditions" prevailed during these years which caused its management to conclude that a distribution of earnings and profits beyond those made would be detrimental to the business.

The record indicates that sometime in 1952 petitioner began to look elsewhere for a source of revenue, a search which ultimately took it into the pin-lever watch field. However, the record further indicates that it was not until late in 1953, or early 1954, that petitioner became aware of the needs generated by this new line. Thus, any attempt to connect the accumulations in issue with the entry into the pin-lever watch field would be unavailing.

Having concluded that the accumulations in issue exceeded reasonable business needs, we must also conclude that petitioner was availed of during each of the years under consideration to avoid the imposition of the surtax upon its shareholders, unless the contrary is shown by a clear preponderance of the evidence.

Petitioner points first to the fact that there was no "leakage" of earnings and profits to any shareholder in the guise of interest-free loans. While the existence of such "leakage" is a positive indication of the proscribed purpose, its absence does not necessarily mean petitioner was *not* so availed of. That earnings and profits were allowed to accumulate within the corporate shell merely indicates, to use a time-honored cliché, that petitioner was a "corporate pocketbook." Nor are we persuaded by Gsell's attempt to increase his foreign dividend income, that petitioner was not a means of avoiding the surtax on his domestic dividends. We are first impressed by the relatively small amount of foreign dividend income actually received. Further, we are not convinced that positive attempts to increase the one, conclusively establishes that he was not attempting to reduce the other. As a foreign stockholder, it may well have been that his only chance to receive a return on his investment would be during those years when the Swiss concern realized a profit. Thus, it was to his benefit that he actively attempt to effect as early a distribution on his foreign investments as possible. On the other hand, so far as petitioner was concerned, if he did not so desire to distribute earn-

ings and profits in a current year, he could wait for a more propitious time.

Finally, the distribution in 1952 of a $7,000 dividend in no way establishes that the $17,000 in earnings and profits which remained undistributed were not retained to avoid the shareholder surtax. We have found the $17,000 accumulation exceeded reasonable business needs. Petitioner has not overcome the statutory presumption that it was retained for the proscribed purpose. Thus, the $7,000 distribution is immaterial.

Moreover, there exist affirmative indications that petitioner was availed of to avoid the shareholder surtax. First we note its meager dividend record over the period extending from 1922 through 1952. Despite 12 years of impaired surpluses, it could look back on some 19 years with an unimpaired surplus. Nevertheless, it chose to distribute earnings and profits in only 5 years. Second, as is usually the case in proceedings of this type, petitioner's stock was closely held. Third, the tax saving effected by the majority shareholder through forbearance, greatly exceeds the penalty now sought to be imposed upon the taxpayer corporation under section 102. Finally, so far as we are able to discern, no valid business reason has been advanced to justify why the challenged accumulations were made.

Therefore, we have concluded that petitioner was availed of during each of the years 1947 through 1950, and 1952, for the purpose of avoiding the imposition of surtax upon its shareholders. Respondent is sustained on this issue.

Throughout our discussion, we have assumed petitioner had shifted the burden of proof to respondent, insofar as its reasonable business needs were concerned, by virtue of the statement of grounds and facts which it filed pursuant to the provisions of section 534 of the 1954 Code.[2] We have reached our conclusions as to its reasonable

---

[2] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * *

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

business needs on the basis of affirmative facts of record. Thus, we need not consider the sufficiency of petitioner's section 534 statement.

The next issue is whether the additions of $5,222.43 and $1,887.73 made by petitioner to its bad debt reserve in 1947 and 1949, respectively, were reasonable.

Section 23(k)(1) of the 1939 Code permits a deduction from income, in the discretion of the Commissioner, of a reasonable addition to a reserve for bad debts. Great latitude is extended the Commissioner in exercising that discretion; and the burden of establishing an abuse of discretion falls heavily upon the taxpayer. *Union National Bank & Trust Co. of Elgin*, 26 T.C. 537 (1956).

Essentially, a bad debt reserve constitutes an estimate of those losses which can reasonably be expected to result from current business debts. In every case, then, the ultimate question is not whether the proposed addition to the reserve is sufficient to absorb the estimated losses, but rather whether the credit balance in the reserve is adequate for that purpose. *Platt Trailer Co.*, 23 T.C. 1065 (1955). While the reasonableness of an addition to the reserve ordinarily will be judged in the light of the taxpayer's experience in collecting its accounts, no hard and fast standard should be adopted. A formula which may have produced a reasonable addition over a series of years might very well prove inadequate under the circumstances attendant upon the year involved. *Black Motor Co.*, 41 B.T.A. 300 (1940), aff'd. 125 F. 2d 977 (C.A. 6, 1942). In the final analysis, the estimate as to the reserve required for any given year will be measured in light of the conditions which exist at the time the estimate is made. Primarily, the reasonableness of any addition will depend on the total amount of debts outstanding at the close of the year, including current debts as well as those which arose in prior years, and the total amount of the existing reserve. Regs. 118, sec. 39.23(k)–5.

The record indicates that petitioner's experience, over the years 1929 through 1946, was that an amount equal to approximately 0.86 per cent of its gross sales turned out to be bad debts. No relationship between accounts receivable and worthless accounts has been shown. The record further reveals that petitioner's 1947 gross sales totaled $522,243, and its yearend receivables $185,409. Included among those receivables was a $22,000 account of Beck Jewelry Enterprises, which we have found to have been extremely doubtful as of that time. Prior to any additions, petitioner's bad debt reserve balance at the close of 1947 was $10,474.07. In the light of these facts, and the principles set forth above, it is clear that petitioner's reserve at the close of 1947 was inadequate to provide for anticipated losses. It is likewise clear that the addition to the reserve in that year of $5,222.43 was reasonable, and we so hold.

By the close of 1949, however, an entirely different situation prevailed. Gross sales during that year totaled $188,772, and yearend receivables $66,227. While $10,547.10 was still owed petitioner on the Beck account, one-half of that amount was determined to be totally worthless, and was written off during 1949 by a charge to the bad debt reserve. Thus at the close of that year only $5,273.36 of petitioner's receivables represented the still doubtful Beck account. The credit balance in its bad debt reserve, prior to any addition and adjusted for the $5,273.74 chargeoff, was $10,422.76. Clearly this was adequate to meet any anticipated losses attributable to its current business debts. Thus, the addition to the reserve in 1949 of $1,887.73 was unreasonable, and properly disallowed by respondent.

But petitioner maintains that its 1949 yearend receivables included $14,963.60 of unpaid Swiss commissions which were "vulnerable to loss or deduction by devaluation, restrictions on currency exchange or political upheaval." There is no support for this contention in the record. Petitioner's experience was that these commissions had always been collected within 4 months after they were earned. Further, other than a nebulously identified instance when petitioner was required to collect these commissions on the basis of a lower rate of exchange than prevailed on the market, it never suffered any loss whatsoever on the accounts. Finally, in light of this record, the mere possibility that these accounts were subject to loss due to devaluation of the franc, restriction on exchange rates, or political occurrence, appears entirely too remote to justify their classification as possible bad debts.

By way of an alternative, should either addition to the reserve be found reasonable, respondent contends that that portion thereof attributable to the Beck account must be taken into income in 1952, the year in which the account was finally collected in full. Originally he determined under this theory that petitioner should report as ordinary income the amounts of $2,395.83 and $13,730.68 in 1951 and 1952, respectively. He now concedes error as to that determination, and in light of our holdings above, would require only that $5,222.43 be added to petitioner's income in 1952. We do not agree. Respondent's own regulations [3] clearly provide that:

In case subsequent realizations upon outstanding debts prove to be more * * * than estimated at the time of the creation of the existing reserve, the amount of the excess * * * in the existing reserve should be reflected in the determination of the reasonable addition necessary in the taxable year.

Thus, the excess will be used to reduce what otherwise may have been a reasonable addition to the reserve in subsequent taxable years. We find nothing, either in the law or cases, which would justify respondent's present position.

[3] Regs. 118, sec. 39.23(k)–5.

Finally, we note that the case of *Geyer, Cornell & Newell, Inc.*, 6 T.C. 96 (1946), is no authority for respondent's present position. There we were confronted by the permanent discontinuation of that portion of the taxpayer's business which gave rise to a need for a bad debt reserve. Moreover, all its accounts receivable had been collected. After noting that the balance in the reserve no longer served any purpose, we held it should be treated as income "where it was built up by additions which were allowed as deductions from income of prior years." Here there was no discontinuation of credit sales. The reserve still served a useful function.

*Decision will be entered under Rule 50.*