Durfee, Judge,
delivered the opinion of the court:
The general question presented by this suit is whether or not a “Federal Insurance Reserve” deducted from income in previous years by a liquidated domestic building and loan association is taxable to a transferee building and loan association for the year in which it acquired all of the assets and liabilities of the liquidated association.
*307 Prior to November 1955, tbe Berea Savings and Loan Company was a building and loan association operating in Ohio, as the plaintiff is at the present time. In July of that year, Berea’s stockholders voted to accept plaintiff’s offer to purchase Berea’s assets and assume its liabilities. Negotiations for the transfer were undertaken and a plan of dissolution was adopted in October. On November 1,1955, Berea sold plaintiff all of its business and property, subject to its liabilities, for about $414,000, an amount arrived at using a basis of $450 for each share of stock outstanding. The sale price was paid into a trust account for the benefit of the stockholders and Berea abandoned its corporate authority and franchise a short time later. Mortgage loans in the face amount of $3,160,805.56, representing amounts loaned by Berea, were transferred to plaintiff.
On its corporation income tax returns for the years 1952 through 1954 and for the portion of 1955 before it ceased operations, Berea had deducted amounts from gross income in the aggregate sum of $133,361.17. In each case the amounts were equivalent to Berea’s net income and were credited to a “Federal Insurance Reserve,” (hereafter referred to as “reserve”) described in the returns as a bad debt reserve. Because of amounts credited prior to 1952, the reserve was carried on Berea’s balance sheet at $216,715.93, as of October 31, 1955. Berea’s final tax return disclosed the sale of the business during that year but it did not report any gain on the sale.
In 1957, the Commissioner of Internal Revenue determined that the amounts charged to the reserve from 1952 to 1955 should be lumped together and taxed as income for the tax period ended October 31, 1955. A deficiency of $63,754.80 for 1955 was asserted principally as a result of this adjustment. That amount, together with interest, was paid by the plaintiff as transferee of Berea and timely claim for refund was filed with the District Director of Internal Revenue.
The position of the Commissioner which resulted in the deficiency was that the reserve was a bad debt reserve which, because of the sale of the business, had lost its purpose so *308 that the portion of the reserve which had originally conferred a tax benefit must be finally closed out to profit and loss and the remaining amount restored to surplus. The charges made to the reserve since 1952 had resulted in a tax benefit of $133,361.17, it was determined. Basically, plaintiff’s theory of recovery is that a liquidation of the kind here involved gives rise to no recognizable gain and that no part of the $133,361.17 is income for 1955 or any other year.
In its argument and briefs, the plaintiff immediately comes to the point of its presentation, namely, that sections 336 and 337 of the Internal Revenue Code of 1954[1] provide that no gain shall be recognized to a corporation which distributes its property pursuant to an approved plan for complete liquidation. In the opinion of the plaintiff, the transaction presently under consideration satisfies the criteria for nonrecognition and there is no reason to depart from such treatment. The development of the positions of the parties has given rise to what had seemed like an ancillary point but which, in fact, is basic to the entire problem. The plaintiff suggests that the reserve maintained by Berea was intended by the Congress to be wholly tax exempt. The Government says that if this is true, it is a complete answer to its position. Consequently, the resolution of that controversy is the starting point in deciding this case.
Prior to 1952, savings and loan associations were entirely exempt from income tax. The exemption was removed, and section 313(e) of the Revenue Act of 1951[2] amended section *309 23 (k) (1) of the 1939 Internal Eevenue Code.[3] It is the contention of the plaintiff that this legislation creates a partial exemption on earnings until a bank’s surplus, undivided profits and reserves totals 12 percent of its deposits, the exemption being articulated in terms of an addition to bad debt reserve. The Government, on the other hand, believes that the reserve, measured as a percentage of deposits, is no different from any reserve for bad debts and should, therefore, be treated no differently.
Section 313 of the Eevenue Act of 1951 was amended on the floor of the Senate to provide a minimum reserve for bad debts computed generally like the reserve ultimately authorized by section 23 (k) (1) of the 1939 Code but utilizing a figure of 10 percent. Certain of the remarks made in the Senate debate are offered by the plaintiff in support of its “exemption” theory. We have perused the pertinent portions of the debate [4] and we are not persuaded that that discussion, considered in its entirety, supports the plaintiff’s position. In reporting on the agreement of the conferees of both Houses on the 1951 Eevenue Act, the Joint (Congressional) Committee on Internal Eevenue Taxation staff summary said of section 313:[5]
Section 313 of the bill removes the income tax exemption of savings and loan associations * * * but allows them to deduct dividends paid to depositors and the *310 amounts placed in bad-debt reserves. The deduction for additions to bad-debt reserves is tbe same as that previously described in the case of mutual savings banks. Thus, the deduction may be a “reasonable addition to reserve for bad debts” but in no case less than the institution deems necessary, until the reserves equal 12 percent of total deposits or share accounts.
The debates and reports incline us to the belief that the Congress was thinking in terms of a bad debt reserve rather than an exemption.
But the plaintiff, in furtherance of its argument states, regardless of the reference to “bad debts” in section 23 (k) of the 1939 Code and section 593 of the 1954 Code and its own characterization of the reserve as a “bad debt reserve,” that the reserve is unlike an ordinary bad debt reserve principally because it is keyed to deposits rather than to debts and does not bear a relationship to loss experience. The defendant suggests, however, that a reserve against long-term loans based on loss experience might well not be sufficient to protect against the loss of customers deposits, the working capital of savings and loan institutions, in the event of a depression or sharp decline in the real estate market. That the Congress may have desired to see unusually large reserves created is not incompatible with the bad debt function of the reserves. The questions of the character of the reserve and the Congressional intent in authorizing it were recently considered by the Tax Court in Arcadia Savings and Loan Association et al. v. Commissioner, 34 T.C. 679, aff’d. 300 F. 2d 247 (9th Cir. 1962). Speaking of the petitioner’s deduction from income credited to the reserve, the court said, at page 682:
* * * It was obviously allowed as an addition to a reserve for bad debts. The language of the provision clearly indicates this and there is no reason to depart from that conclusion because of anything that was said by members of Congress in the discussion leading up to the enactment of the provision. Congress was obviously generous in allowing the deduction. This might have been because of its desire to protect the solvency of building and loan associations and provide them with sufficient reserves to withstand possible adverse economic conditions. Nevertheless, the provisions which it made *311 were for a reasonable addition to a reserve for bad debts. * * *
Similarly, the plaintiff’s argument that because the Congress required that reserves be built up to five percent of deposits, as prescribed in the National Housing Act,[6] it could not have intended reserves measured by 12 percent of deposits to be bad debt reserves must be rejected. Nothing in that provision of the Housing Act suggests that the five percent reserve is other than a minimum figure and, thus, not inconsistent with the 12 percent figure. Moreover, nothing in the provision requires that it be applied to every savings and loan association. Furthermore, we do not think that isolated provisions in the banking laws provide authoritative interpretations for the Internal Bevenue Code.
We conclude, therefore, that the Congress, having removed the blanket tax exemption of savings and loan associations, did not intend to exempt the amounts accrued in reserves but rather that it intended to create liberal reserves against the possibility of unrealized loan receivables. Consequently, in proceeding to the issue of recognition on liquidation we will consider the reserve to be a bad debt reserve.
The provision for nonrecognition of gain on the sale of assets by a liquidating corporation was introduced into the 1954 Code[7] to avoid taxation of both the corporation and the stockholder on the same transaction. The problem of whether the sale had been made by the corporation before liquidation or the stockholders after liquidation had resulted in doubt and confusion in this area.[8] Mertens, The Law of Federal Income Taxation, Code Commentary, Sec. 337. As we noted at the outset the plaintiff contends that it was a sale within the meaning of this section which gave rise to the item on which the Commissioner based his deficiency determination and, hence, taxation of that amount as income was erroneous.
The reserve method of protection against bad debts which the plaintiff chose under the authorization of section *312 23 (k) (1) of the 1939 Code and section 593 of the 1954 Code is an alternative to deductions at the time bad debts occur. When an uncollectible debt on which a deduction from gross income has been taken is subsequently collected, the amount so collected is treated as income in the year when received. S. Rossin Sons, Inc. v. Commissioner, 113 F. 2d 652 (2d Cir. 1940); Putnam National Bank v. Commissioner, 50 F. 2d 158 (5th Cir. 1931). The Tax Court has consistently held that any balance in a reserve for bad debts is similarly to be restored to income in the year in which the need for it ceases. Arcadia Savings and Loan Association et al. v. Commisisoner, supra; West Seattle National Bank of Seattle v. Commissioner, 33 T.C. 341, aff. 288 F. 2d 41 (9th Cir., Feb. 27, 1961); Geyer, Cornell & Newell, Inc. v. Commissioner, 6 T.C. 96 (1946). In both the Arcadia and West Seattle cases the claim of nonrecognition of gain relative to the bad debt reserve of a liquidated savings and loan association was rejected. And in Arcadia also the court expressed the belief that a bank’s bad debt reserve should be treated no differently from any other bad debt reserve.
Indeed, all of the important arguments made by the plaintiff in this suit were considered either by the Tax Court or the Court of Appeals in West Seattle and were rejected. This plaintiff maintains that any economic benefit it has received is derived from the sale of its assets placing the transaction within the realm of section 337. Concerning this point the Tax Court said in the West Seattle opinion:
But this section affords relief only from a double tax on the gain from a sale of assets. The income here sought to be taxed did not arise from the sale of assets. The only relation the sale of petitioner’s assets had to this income is that it removed the necessity for maintaining the reserve for bad debts because petitioner no longer held receivables, the full collection of which might be doubtful.
This is not a case of the appreciation of an asset realized at the time of sale. Bather the sale of the asset has freed a particular charge against capital which, having been derived from income, must be returned to income. Such a deter *313 mination does not do violence to the meaning or purpose of section 337.[9]
The Court of Appeals in West Seattle considered the contention now being made here, viz, that sections 1011 and 1016(a) of the 1054 Code[10] require that in determining the existence of gain the basis of the asset must be adjusted by the amount of the reserve since it is a capital asset. It cited its own opinion in National Bank of Commerce of Seattle v. Commissioner, 115 F. 2d 875 (1940), commenting:
There it was said that to the extent of deductions taken, a debt loses its nature as capital and takes on the character of the untaxed income which the deduction represents. * * *
In other words, the court assumed without deciding that an adjusted basis was arrived at; nevertheless, it still held that gain of this sort must be recognized. The court went on to say:
Nor does the fact that the bad debt reserve is generally regarded as a valuation reserve affect the result. While the book value established thereby has an accounting significance, it is still based upon an expectation that loss of value will occur and not upon the fact that such loss has already occurred. It is a prediction of value and not a statement of present fact. Recovery of a debt which has been written off is not then a realization of a gain in asset value. It simply demonstrates that the value prediction was faulty and did not conform to the fact.
In this respect the bad debt reserve is quite different from the depreciation reserve. A depreciation or depletion reserve is founded not upon the expectation of loss but upon facts. It recognizes that through depletion, wear and tear or obsolescence, the asset has to a certain extent actually been used up and that what is recovered by sale is recovered only from the unused portion of the asset. * * * The adjustment reflects the extent to which the asset has actually been exhausted * * *. The question is whether a gain or loss has been realized on that which remains.
*314 The last remarks are relevant to the instant case since the plaintiff seeks to analogize the depreciation reserve and the non-recognition of gain thereon to the bad debt reserve. We do not consider it necessary to comment further on the dissimilarity of theory and purpose underlying these two kinds of reserves.
Further, the plaintiff argues for non-recognition by pointing out that under sections 332(a) and 354(a) (1) of the 1954 Code[11] no gain is recognized on the liquidation of subsidiaries or on stock exchanges in corporate reorganizations. The short answer to this, we think, is to emphasize the clear distinction between a complete liquidation on the one hand and liquidation into a parent corporation and reorganization of a corporation’s capital structure on the other. In the latter situations the holder of the asset continues in existence, although in an altered form, and continues to experience the risk of bad debt loss. Thus, unlike the former situation where the corporation goes out of existence, the reserve does not lose its reason for existence and there is no reason not to accord non-recognition.
The foregoing discussion leads inevitably to the following conclusions on the two primary issues: Berea’s “Federal Insurance Reserve” should be treated as a reserve for bad debts in considering the effect of the bank’s liquidation, and the balance remaining in that reserve after sale of the asset it complements must be considered income which is not subject to the non-recognition provisions of sections 336 and 337. The Commissioner’s treatment of the reserve as ordinary income, to the extent that the credits thereto had conferred a tax benefit, was also correct. The recovery of an obligation previously deducted from income as uncollectible is treated as ordinary income. Merchants Nat. Bank of Mobile v. Commissioner, 199 F. 2d 657 (5th Cir. 1952), affirming 14 T.C. 1375. As to plaintiff’s claim that any gain recognized must be capital gain we will treat a reserve balance for bad debts in the same manner as actual losses deducted, as we have throughout this opinion. The credits to the reserve over the years reduced ordinary income and it is only *315 realistic to return the balance to income. This was the treatment accorded to the bad debt reserves which were restored to income rather than treated as gams in West Seattle and Arcadia, supra.
Finally, the contention that gain should be taxed at the rates applicable to the years when the additions to the reserve were made rather than those of the year of liquidation must be rejected. The tax benefit rule implicitly recognized in Dobson v. Commissioner, 320 U.S. 489 (1943) finds legislative sanction in section 22(b) (12) of the 1939 Code and section 111 of the 1954 Code.[12] Those sections exclude from gross income only that amount of bad debt recovery the deductions or credits for which did not result in a reduction in tax when taken. Here, however, plaintiff’s income was reduced to the extent of the additions to the reserve in the years taken. Perry v. United States, 142 Ct. Cl. 7 (1958) is distinguishable since the recovery in that case involved a previously taken charitable deduction and not the bad debt, prior tax, or delinquency amount specified in section 111.
Accordingly, the refund of income tax deficiency here sought by the plaintiff is denied. The petition will be dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF EAOT
The court, having considered the evidence, the report of Trial Commissioner Saul E. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is, and at all times pertinent hereto has been, an association duly organized and existing under the laws of the United States with its principal place of business in Cleveland, Ohio. It has for many years been engaged in Cleveland, Ohio, in the business of a domestic building and loan association, accepting deposits from its members and lending the money so deposited on the security of first mortgages on real estate.
*316 2. Prior to November 16, 1955, The Berea Savings and Loan Company (hereinafter referred to as Berea), which was incorporated in 1916 under the laws of the State of Ohio, was also a domestic building and loan association engaged in the same business as plaintiff, but in Berea, Ohio. In May 1955, plaintiff commenced negotiations for the purchase of Berea. These negotiations culminated in the submission by plaintiff of an offer to purchase the assets and assume the liabilities of Berea by paying to Berea’s stockholders $450 for each share held by them.
3. At a special stockholders’ meeting of Berea held on July 12, 1955, the stockholders unanimously agreed to accept the offer of plaintiff, hereinabove referred to, and to “proceed to pass any necessary resolution to effect the sale of assets and to dissolve the company.” Thereupon, the stockholders unanimously resolved that the officers of Berea “proceed to effect sale of assets, dissolution of this company, and surrender and abandonment of its corporate authority and franchises pursuant to statute * *
4. On July 29, 1955, Berea and plaintiff entered into an Agreement (Berea being called therein the “Seller” and plaintiff the “Buyer”) for the sale to plaintiff of all of Berea’s—
business and properties, including all of the Seller’s real estate structures, equipment, appliances and furniture, notes and mortgages securing same, accounts receivable, judgment liens and dioses in action together with all materials and supplies, all bonds, stock of the Home Loan Bank of Cincinnati and the good will of Seller’s business.
The agreed purchase price was “a sum equal to 450 dollars per share” of Berea’s stock “and the assumption by the Buyer of all current and contingent liabilities pertaining to or connected with the business operated by the Seller t- * * »
5. In August 1955, Berea’s officers and directors proceeded with the necessary steps leading to Berea’s dissolution in accordance with the authority of the stockholders’ resolution of July 12, 1955. Consent to such dissolution was given by *317 tlie Superintendent of Building and Loan Associations of Ohio on September 28, 1955. A plan of dissolution was adopted on October 28, 1955. Berea surrendered and abandoned its corporate authority and franchises on November 16, 1955.
6. On November 1, 1955, Berea sold and transferred to plaintiff all of its business and property, subject to its liabilities, in exchange for approximately $414,900 which was thereafter on November 1 and 2, 1955, transferred to a special trustees’ account for the benefit of Berea’s stockholders and in complete liquidation of Berea. Berea’s business was thereafter operated as a branch of the plaintiff, with more than 99.6 percent of Berea’s depositors continuing as depositors of the plaintiff.
7. Included in the property transferred to plaintiff by Berea were capital assets in the form of mortgage loans in the face amount of $3,160,805.56, representing amounts of cash advanced by Berea to borrowers in the course of its business.
8. (a) On March 16, 1953, Berea filed with the Director of Internal Revenue, Cleveland, Ohio, a corporation income tax return (form 1120) for the calendar year 1952, in which it reported its “Net income” as “None.”
(b) On March 4, 1954, Berea filed with the District Director of Internal Revenue, Cleveland, Ohio, a similar return for the calendar year 1953, in which it likewise reported its “Net income” as “None.”
(c) On March 11, 1955, Berea filed with said District Director a similar return for the calendar year 1954, in which it reported its “Taxable income * * *” as “None.”
(d) On June 15, 1956 (which was within the period for filing as duly extended), Berea filed with the Director of Internal Revenue, Cleveland, Ohio, a similar return for the calendar year 1955, in which it likewise reported its “Taxable income * * *” as “None.” This was Berea’s final return and covered its operations through October 31, 1955.
(e) In the above returns, there was in each case listed under “Deductions” (from “Gross Income” in order to determine net income or taxable income) an item captioned *318 “Bad Debts.” In said returns, Berea entered the following amounts under said caption:

Tear Amount

1952 _ $19,824.69
1953 _ 25,362.72
1954 _ 31,907. 46
1955 _ 56, 266.30
$133, 361.17
(f) The amounts set forth in paragraph (e) were computed as being equivalent to its net income for the years in question, and said amounts were in each instance credited to Berea’s “Federal Insurance Reserve”, which Berea described as “our Bad Debt Reserve.” Berea’s treatment and determination of this calculation in computing its net or taxable income is illustrated in its “Bad Debts” Schedule (Schedule F) attached to its final 1955 return, as follows:
The Berea Savings and Loan Company
44 E. Bridge Street
Berea, Ohio
October 31, 1955
Schedule F. — Bad debts
12% of Savings Accounts ($3,601,657.44) October 31, 1955-Less Surplus and Reserves, December 31,1954 : 432, 198. 89
Total Assets_ _ 3, 572, 497. 14
Less — Running Stock_ 691. 00
Savings Deposits_ 3, 075, 996. 84
Loans in Process_ 180, 071. 45
Borrowers Advances. Insurance, and Taxes_ 6, 226. 76
Permanent Stock_ 73, 764. 75
Other Liabilities_ 965. 04
Total. 3, 337, 715. 84
Surplus and Reserves_ 234, 781. 30
Tentative Deduction for Bad Debts_ 197, 417. 59
Allowable deduction for bad debts may not exceed the Lesser of the above or Net Income — Net Income Being_ 56, 266. 30
Note: Total Net Income of $56,266.30 has been credited to Federal Insurance Reserve which is our Bad Debt Reserve.
Taxpayer’s surplus, undivided profits and reserves at January 1, 1955 amounted to less than 12 per cent of its total deposits or with- *319 drawable accounts at October 31, 1955. Pursuant to Section 593 of tbe Internal Revenue Code, taxpayer bas elected tbe reserve method of computing bad debts in arriving at net income for Federal Income Tax purposes. For tbe ten months (January 1, 1955-October 31, 1955) taxpayer’s net income before any deductions for bad debts, amounts to $56,266.30. Accordingly, pursuant to Section 593 taxpayer has tafeen a deduction in arriving at net income for an addition to tbe Reserve for Bad Debts in an amount equal to the net income hereinbefore referred to. Also, taxpayer bas set aside tbe amount of such deduction in tbe reserve account designated as Federal Insurance Reserve which is tbe Bad Debt Reserve.
In the event of the taxpayer’s net income (before deduction for bad debts) is finally determined to be different from such net income hereinbefore referred to, taxpayer hereby reserves tbe right to revise its deduction for an addition to tbe Reserve for Bad Debts so that such revised deduction will equal tbe net income (before any deduction for bad debts) as finally determined. Also, taxpayer hereby reserves tbe right to so revise tbe amount of such deduction set aside in tbe Reserve for Bad Debts on its regular books of account.
9. As of October 31, 1955, the total amount carried by Berea in its Federal Insurance Reserve was $216,715.93, as shown on the following Schedule (Schedule L) containing a “Balance Sheet” for said date (and for December 31,1954), which Schedule was attached to its aforementioned final income tax return:
Schedule L — Balance Sheets

Assets December SI, 195% October SI, 1955

Mortgage Loans- 2, 963, 548. 06 3,160, 805. 56
Real Estate Sold On Contract_ 1, 015.12 1, 015.12
Federal Home Loan Bank Stock- 46,200. 00 56,100. 00
Government Bonds- 32,000. 00 25,000.00
Cask on Hand and in Banks_ 485,184. 81 838, 515. 99
Land _ 1,700.00 1,700.00
Office Building_ 34, 795. 58 34, 795. 58
Less Reserve for Dep’n_ 3, 286. 67 31, 508. 91 3, 853. 34 30, 942. 24
Furniture, Fixtures and Equipment- 14, 351. 35 14, 389. 20
Less Reserve for Dep’n_ 3, 849. 01 10, 502. 34 4, 721. 25 9, 667. 95
Deferred Charges_ 837.90 602.95
Total Assets_ 3, 572, 497.14 4,124, 349. 81
*320 Liabilities December 31,1954 October 31,1955
Running (Withdrawable) Stock— 691. 00 31. 00
Savings Deposits- 3, 075, 996. 84 3, 601, 657. 44
Loans in Process_ 180, 071. 45 153, 082 .05
Borrowers Advances, Insurance and Taxes- 6, 226. 76 5, 459. 56
Other Liabilities— Social Security & Other Taxes-221. 92
Escrows & unapplied Credits_ 217. 32 248. 72
Dividends Payable 698. 84 Accounts Payable-269. 85 779. 62
Reserve Outstanding Checks_ 48.88 965.04 48. 88 1, 568. 99
Permanent Non-Withdrawable Stock_ 73, 764. 75 73, 764. 75
Federal Insurance Reserve_ 160, 453. 26 216, 715. 93
Surplus — undivided Profits_ 74, 328. 04 72, 070. 09
Total Liabilities 3, 572, 497.14 4,124, 349. 81
All Assets and Liabilities were sold to Citizens Federal Savings and Loan Association as at close of business October 31, 1955.
Form 966 U.S. Return of information under Section 148(d) of The Internal Revenue Code to be Filed by Corporations witbin 30 days after Adoption of Resolution or Plan of Dissolution or Complete or Partial Liquidation, was duly filed as were forms 1099L.
Final Liquidating Dividends, totaling $414,927.00, were deposited witb Trustees at October 31, 1955. The corporate charter was subsequently surrendered.
10. The Federal Insurance Reserve was set up as an account on Berea’s books on December 20, 1950, when Berea was first issued a certificate of insurance by the Federal Savings and Loan Insurance Corporation. Prior to January 1,1952, Berea was entirely exempt from Federal income taxes. Thereafter, during the years 1952 through 1955, its net income was treated as described in finding 8(f), resulting in no tax liability and in the addition of such net income to its Federal Insurance Reserve.
11. As shown by its returns, the amounts added to Berea’s Federal Insurance Reserve and, as set forth in finding 8(f), the “Bad Debts” amounts deducted by it for tax purposes (on the cash, calendar-year basis) were as follows:

*321
Amount Added Amount Taxable Period to Reserve Deducted

Prior to 1952_ $83, 357.12 0
1952 _ 19,824.69 $19,824.69
1953 _ 25,362.72 25,362.72
1954 _ 31,907.46 31,907.46
1955 _ 56,266.30 56,266.30
$216,718.29 [13] $133, 361.17
12. In its final Federal income tax return, referred to in finding 8(d), Berea, relying on Section 337 of the Internal Revenue Code of 1954, did not report any gain on the sale of its property to the plaintiff, but disclosed in the return the fact that the sale had occurred.
13. Upon audit of Berea’s final 1955 return, which, as stated, covered the period beginning in January and ending on October 31, 1955, the Commissioner of Internal Revenue determined that the amounts charged by Berea on its books to the account styled “Federal Insurance Reserve” and deducted by Berea for the years 1952 through 1954, and for the period ending October 31, 1955, aggregating $133,361.17, should be lumped together and taxed all in one year as additional income for the period ending October 31,1955. Plaintiff, as transferee of Berea, was so advised in a so-called 30-day letter dated August 15,1957, from the District Director of Internal Revenue, which forwarded, as an enclosure thereto, an Internal Revenue Agent’s Report dated June 26, 1957. The Report set forth the Agent’s position to be that, because of the sale in 1955 of Berea’s assets and the assump *322 tion. of its liabilities, the reserve for bad debts (Federal Insurance Reserve) of the taxpayer lost its purpose and, therefore, it should have been closed by a journal entry which would have closed to profit and loss that portion of the reserve ($133,361.17 during the years 1952-1955) which gave a tax benefit, and the balance, i.e., the difference between $216,715.93 and $133,361.17 or $83,354.76, which gave no tax benefit, should be restored to surplus. The Agent’s determination, together with five other minor adjustments, resulted in the determination by the Commissioner of a deficiency of $63,754.80 for 1955 which, together with interest thereon, was thereafter assessed against plaintiff as transferee of Berea, and duly paid by plaintiff.
14. In two unpublished Revenue Rulings dated August 24, 1955 and April 11, 1958, respectively, issued by the Director of the Tax Rulings Division, Office of the Commissioner of Internal Revenue, Treasury Department, (neither of which involved the instant acquisition of Berea) it was ruled that, where substantially all the assets of an Ohio savings and loan company are transferred in a tax-free reorganization, “no gain or loss will be recognized to” such company “upon the exchange of its assets (including mortgage loans and the related reserve for bad debts) * *
15. On March 20, 1958, plaintiff, as transferee of Berea, filed with the District Director of Internal Revenue, Cleveland, Ohio, a timely claim for refund in the amount of $70,-308.44, “plus interest or such other amount as is legally refundable.” In the claim, plaintiff stated:
Citizens contends that the Commissioner erred in treating the amount of $133,361.17 as additional income to Berea in 1955, and hence that Citizens is entitled to a refund of the tax and deficiency interest paid by it as transferee, resulting from such inclusion, together with interest thereon as allowed by law, because:
1. No part of the amount of $133,361.17 is income for 1955 or any other year.
2. No gain or loss is recognized in connection with the transfer of Berea’s property to Citizens.
3. Alternatively, if the amount of $133,361.17 was properly determined to be income in 1955, it should have been taxed either
*323 A. as capital gain, or,
B. by way of equitable recoupment, at tbe tax rates which would have been applicable if such amount had been included in income for the respective years in which it was deducted.
Said claim has been neither allowed nor rejected. On November 12, 1958, plaintiff timely filed its petition herein.
16. Pursuant to Buie 38 (c), the parties, with the approval of the commissioner, agreed that there should be a separate determination of the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
conclusion op law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Title 20, D.S.C.
§ 336. General rule
Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.
§ 337. Gain or loss on sales or exchanges in connection with certain liquidations
(a) General rule. — If—
(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

 65 Stat. 452,499.

 Section 23(k) (1), Title 26 TJ.S.C. (1952 Ed.) provides, in pertinent part:
* * * In the case of a mutual savings bank * * *, a domestic building and loan association, and a cooperative bank * * *, the reasonable addition to a reserve for bad debts shall be determined with due regard to the amount of the taxpayer’s surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of (A) the amount of its net income for the taxable year, computed without regard to this subsection, or (B) the amount by which 12 per centum of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year.
Substantially the same provision appears in the 1954 Code at section 593, Title 26 TJ.S.C.

 97 Cong. Rec., Part 9 (1951).

 1951-2 Cum. Bull. 287,301.

 Title 12, U.S.C., § 1726(b).

 Title 26, U.S.C., § 337.

 Compare Commissioner v. Court Holding Co., 324 U.S. 331 (1944) and United States v. Cumberland Public Service Co., 338 U.S. 451 (1950).

 See, Katcher, Liquidating Problems and Pitfalls, N.Y.U. 17th Inst. on Fed. Tax., 827 at 840 (1959).

 Title 26, U.S.C. §§ 1011, 1016(a).

 Title 26, U.S.C., §§ 332(a), 354(a)(1).

 Title 26, U.S.C., § 22(b) (12) (1952 Ed.) ; Title 26, U.S.C., § 111.

 The correct figure should be $216,715.93, as set forth in finding 9. The reconcilement is as follows:
In 1953, the amount credited to the Reserve should have been greater by $1.27, representing interest erroneously deducted twice by Berea. In 1955, the amount credited to the Reserve should have been greater by $25, representing a contribution erroneously charged to the Reserve. Also, an erroneous understatement of interest expense by $28.63 would reduce the Reserve by that amount. Thus, the following corrections should be made to the total amount added to the Reserve to arrive at the correct balance on October 31, 1955, as set forth in finding 9 :
Total additions to Reserve_ $216, 718. 29
Credit — 1953_ 1. 27
Debit — 1954_ 28. 63
Credit — 1955_ 25. 00
Corrected Balance_ $216, 715. 93