## DIFFERENTIAL STEEL CAR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23909.   Promulgated February 23, 1951.

*John J. Kendrick, Esq., G. Charles Scharfy, Esq.,* and *Robert Kniffin, Esq.,* for the petitioner.

*Clarence E. Price, Esq.,* for the respondent.

### FINDINGS OF FACT AND OPINION.

TIETJENS, *Judge:* This case involves the following tax deficiencies asserted against petitioner:

| Year | Income tax | Declared value excess-profits tax | Excess profits tax | Total |
|---|---|---|---|---|
| 1943 | 0 | $18,667.57 | $123,250.05 | $141,917.62 |
| 1944 | $2,778.56 | 8,870.67 | 73,607.28 | 85,256.51 |
| | 2,778.56 | 27,538.24 | 196,857.33 | 227,174.13 |

Several issues have been conceded and will be reflected in Rule 50 computation. The following issues remain for disposition:

(1) Whether the amount of $8,582.92 received by petitioner in 1943 as profit on the sale of certain equipment was (a) ordinary income as treated by respondent, or, as contended by petitioner, either (b) abnormal income within section 721 of the Internal Rvenue Code, or (c) long term capital gain within section 117 (j);

(2) Whether respondent, for the calendar years 1943 and 1944, properly determined petitioner's excess profits tax credit; and

(3) Whether respondent properly disallowed as deductions from gross income the amounts of $120,000 and $95,250 for the calendar

years 1943 and 1944, respectively, claimed to have been paid by petitioner as royalties for the use of patents in those years.

For clarity, general findings of fact applicable to all issues first will be made, then findings and decision on each issue separately.

### GENERAL FINDINGS OF FACT.

The facts stipulated are so found and the stipulation by reference is made part of our findings.

The income and excess profits tax returns for the years here involved were filed with the collector of internal revenue for the tenth district of Ohio. On June 13, 1949, petitioner filed with the collector of internal revenue at Toledo, Ohio, its claim for refund of income tax paid by it for the year 1943 in the amount of $7,521.28.

Petitioner is an Ohio corporation with its principal office at Findlay, Ohio. It was incorporated in 1927 under the name of Differential Car Manufacturing Corporation and is the continuing corporation which resulted from a merger on December 30, 1937, of The Differential Steel Car Company with petitioner which at that time changed its name to Differential Steel Car Company.

During the taxable years and from the time of incorporation petitioner and its predecessor were engaged in the manufacture and sale of specially designed haulage equipment for mines, railroads, quarries, etc.

### Findings of Fact—Issue No. 1.

Almost all of petitioner's products were manufactured and sold under special orders, that is, "tailor-made" for particular customers.

In 1937 a customer contracted with petitioner for the manufacture of three haulage units. Petitioner, due to delays in securing equipment was unable to make the specified delivery date and the customer refused to accept the units. The units were nevertheless completed in October 1937 at a cost of a great deal more than originally estimated and remained on tracks at petitioner's plant.

Meanwhile there was a rising market for such equipment and petitioner continued negotiations with the customer hoping satisfactorily to consummate the sale. These negotiations fell through finally in 1941.

Petitioner's operations were such that a switch engine was needed to transfer cars under construction from one bay of the plant to another as the manufacturing process proceeded. For about six months in 1942 and four months in 1943 one of the unsold three units was used as a switch engine to supplement the engine ordinarily used.

In 1943 this unit was sold at a profit of $8,582.92. The unit was of the same general class of equipment normally manufactured and sold by petitioner in the regular course of business.

This was the only time a customer ever had refused delivery of equipment contracted for with petitioner.

In its excess profits tax return for 1943, on schedule A, petitioner claimed abnormal income as a deduction in the amount of $8,582.92. This the Commissioner disallowed with the explanation in the deficiency notice that it had not been substantiated.

### Opinion—Issue No. 1.

Petitioner contends that the entire profit of $8,582.92 realized from the sale of equipment manufactured in 1937 for sale and delivery to a particular customer in that year but which was sold to someone else in 1943, constituted "abnormal income" within subsection (a) (1) of section 721, Internal Revenue Code,[1] attributable to a previous year within subsection (b) of that section and thus was properly excludible from its excess profits net income for the year 1943 as provided in subsection (c) of that section.

The basis for petitioner's argument is the "unique" set of circumstances, so far as petitioner's business is concerned, which gave rise to the profit in 1943. It claims that in the normal course of its business the profit would have been realized in 1937 and so was properly attributable to that year instead of 1943.

We need not decide whether the item was properly classifiable as abnormal within the meaning of section 721 (a) (1). Even if it be conceded that it was so classifiable yet petitioner must fail in its claim, for petitioner has not shown the income to be attributable to another year as required by section 721 (b). It is claimed that because the equipment sold was manufactured for sale in 1937 the profit on the sale in 1943 should be attributed to 1937. But for all this record shows we cannot determine what profit, if any, would have been realized had the sale been made in 1937. Petitioner's president testified that the equipment cost a great deal more than originally estimated. The cost of the equipment is shown on petitioner's tax return, but nowhere can we find what the 1937 contract sale price was. Nor can we be certain whether or not the cost shown on the return was the original cost of producing the equipment, or included elements of cost, such as the cost of sales efforts, properly attributable to the years intervening between 1937 and 1943. Futhermore, there is evidence that there was a rising market for equipment of this kind in the early 1940's and we think that the sale finally made was primarily

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, * * *

the result of increased demand for the product. In the circumstances, we cannot properly attribute any portion of the $8,582.92 to years other than 1943, and petitioner must fail in his claim for relief under section 721. *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96.

We turn now to petitioner's alternative contention, that the $8,582.92 profit was derived from a sale of "property used in the trade or business" within the meaning of section 117 (j), Internal Revenue Code, and therefore should be "considered as gains * * * from sales * * * of capital assets held for more than 6 months," as provided in that section. Petitioner's argument is that while the equipment in question was initially part of petitioner's stock in trade, yet, beginning in 1942 and up until the sale in 1943 the equipment was put to use in its business and was thereby converted into "property used in the trade or business," the conversion dating from the beginning of use in 1942. We see no reason why this contention should not prevail. Cf. *Reginald Denny*, 33 B. T. A. 738; *Leland Hazard*, 7 T. C. 372; and *Nelson A. Farry*, 13 T. C. 8. Since the equipment was held in such use for more than six months the gain on its sale should have been treated as a long term capital gain, and we so hold.

### *Findings of Fact—Issue No. 2.*

In 1927 petitioner's predecessor acquired through purchase at a mortgage foreclosure sale, for $18,200, certain property known as its North Plant, such assets being taken upon the books of petitioner's predecessor at approximately that figure. In the same year the predecessor corporation paid to the United States the sum of $20,000 in settlement of a judgment obtained by the Government in the same foreclosure proceedings on a second mortgage which it held on the property. This $20,000 was charged off to profit and loss and deducted by petitioner's predecessor on its 1927 income tax return and such amount has never since been restored on the books.

At the time the plant was acquired it contained some machinery and equipment placed there by the prior occupant. Petitioner's predecessor took over this machinery and equipment with the plant and put it to use in the business.

On December 30, 1937, at the time of the merger of The Differential Steel Car Company with petitioner, The Differential Steel Car Company's books of account showed an operating deficit in the amount of $50,084.68.

In petitioner's corporation excess profits tax returns for the calendar years 1943 and 1944 there were included in schedule "C" an amount of $168,202.19 as property paid in for stock, or as paid in surplus, or as a contribution to capital, and the amount of $50,084.68 as deficit

in earnings and profits of another corporation under section 718 (a) (7). Prior to these years the petitioner did not include the above amounts in its returns as part of its invested capital.

In the statement accompanying the deficiency notice dated April 1, 1949, sent by the Commissioner to petitioner, appears the following:

In computing invested capital as a basis for the excess profits credit, money and property paid in for stock, or as a contribution to capital, has been determined, as follows:

| | |
|---|---:|
| Jan. 10, 1927—Assets acquired from The Differential Steel Car Co. for stock | $101,434.23 |
| Stock issued for accounts payable | 1,965.77 |
| Stock issued for cash | 77,550.00 |
| Dec. 28, 1937—Assets acquired from The Differential Steel Car Company as contribution to capital | 1,615.32 |
| Jan. 1, 1938–Jan. 1, 1941: Cash paid in on stock subscriptions | 90,475.00 |
| Total | 273,040.32 |

Your contention that this total amount should be increased by $168,202.19, relating to property acquired by a predecessor from The Chicago Steel Wheel Company, has been denied for lack of substantiation. Your further contention that accumulated earnings and profits, includible in invested capital, should be increased by $50,084.68 representing a deficit in earnings and profits of a predecessor corporation, has been denied because of the inapplicability of sections 718 (a) (7) and 718 (c) (5) of the Internal Revenue Code.

*Opinion—Issue No. 2.*

Petitioner claims that it is entitled to include the property and equipment of its North Plant in its equity invested capital for excess profits credit purposes at a figure substantially in excess of the figure at which the plant had been carried on petitioner's books, that figure being $16,556, representing the depreciated balance of the $18,200 paid at the foreclosure sale for the plant.

Petitioner argues that the proper figure at which it should be allowed to include the plant is $105,000. In substantiation of this figure it is pointed out that the evidence shows that the plant had cost petitioner at least $38,200 in cash (the amount paid at the foreclosure sale plus the $20,000 paid the Government on its second mortgage judgment). Furthermore, petitioner's president testified that in his opinion the fair market value of the plant at the time of its acquisition was $105,000. He also testified that in 1920 the plant had been sold for $100,000, this figure being made up as follows:

$5,000 cash
27,500 notes of the purchaser
18,000 assumption by purchaser of first mortgage
24,500 assumption by purchaser of second mortgage
25,000 preferred stock of purchaser

$100,000

Reluctant as we are to decide issues on the basis of lack of proof, from this evidence we are able to conclude only that petitioner is entitled to have allowed, in addition to what the Commissioner has already allowed, the $20,000 paid in settlement of the second mortgage judgment against the plant. It does not appear that this amount was included by the Commissioner, but it seems to be a proper cost item in connection with the acquisition of the plant and should be included in petitioner's equity invested capital.

The evidence adduced to support the $105,000 figure is unconvincing. It consists merely of the opinion of petitioner's president without substantiating facts. The sale of the property a few years before for a claimed $100,000, upon analysis, does not help petitioner. Only $5,000 in cash was involved. The rest of the $100,000 figure which consisted of notes, the assumption of mortgages and preferred stock of the purchasing corporation mean little. There is not a bit of evidence as to the financial condition of the purchaser or the value, if any, of its preferred stock. That the purchase had little substance may be gathered from the fact that within a few years the purchaser had defaulted on its mortgages and that petitioner acquired the plant at foreclosure proceedings for a bid price of $18,200. This record does not justify a finding that petitioner is entitled to include any amount with reference to its North Plant in equity invested capital other than as allowed by the Commissioner plus the $20,000 referred to above.

We turn now to petitioner's claim with respect to the machinery and equipment contained in the North Plant at the time of its acquisition. This machinery and equipment was not covered by the mortgages foreclosed in 1927. Nevertheless, petitioner took possession of and used the machinery and equipment in its business apparently without any adverse claim being asserted to it. In petitioner's view this amounted to property contributed to petitioner's capital within section 718 (a) (2), either by the corporation which had placed the equipment in the building or by the preferred shareholders of that corporation. A fair market value of $65,000 is ascribed by petitioner to this item.

It is difficult to gather from this record why either the corporation which had previously occupied the North Plant or its preferred stockholders should want to contribute capital to petitioner. Even though we assume that the machinery and equipment constituted a contribution to capital within the ambit of *Brown Shoe Co.* v. *Commissioner*, 339 U. S. 583, and *Douglas Hotel Co.*, 14 T. C. 1136, nevertheless the burden is on petitioner to produce facts from which we can find the value of the contribution. Here again nothing has been adduced but the unsupported testimony of petitioner's president, that there was some equipment and machinery in the building when petitioner took over and that in his opinion it was worth $65,000. Details as to type

of equipment, the number and character of the machines, whether they were new or used, their state of repair if used—none of these helpful details are given. Without the aid of facts we are unable to place any value on the equipment and machinery and we agree with the Commissioner in his denial of this item for lack of substantiation. Cf. *Kilburn Lincoln Machine Co.*, 2 B. T. A. 363.

The next phase of the equity invested capital issue to be dealt with is whether petitioner is entitled to include under the provisions of section 718 the amount of $50,084.68 representing the deficit of a predecessor corporation. The pertinent provisions of section 718 appear in the margin.[2]

Petitioner in contending that it is entitled to the benefits of section 718 (a) (7) asserts: (1) that at the time of the merger in 1937 The Differential Steel Car Company's deficit was assumed by petitioner as the continuing corporation; (2) that The Differential Steel Car Company was the transferor and petitioner the transferee; (3) that after the merger the sole share certificates outstanding were those of petitioner; (4) that the shareholders of The Differential Steel Car Company owned all of the shares of petitioner; and (5) that no consideration for the transfer of the property existed other than the transfer of shares of the petitioner's capital stock.

Respondent, on this question, argues that the record is devoid of evidence which would show that the formation of petitioner was such as to entitle it to the benefits of section 718.

A careful consideration of the whole record compels us to agree with respondent.

---

[2] SEC. 718. EQUITY INVESTED CAPITAL.

(a) Definition.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

\* \* \* \* \* \* \*

(7) Deficit in earnings and profits of another corporation.—In the case of a transferee, as defined in subsection (c) (5), an amount, determined under such paragraph, equal to the portion of the deficit in earnings and profits of a transferor attributable to property received previously to such day.

\* \* \* \* \* \* \*

(c) Rules for Application of Subsections (a) and (b).—For the purposes of subsections (a) and (b)—

\* \* \* \* \* \* \*

(5) Deficit in earnings and profits.—Earnings and profits of transferor and transferee.—If a corporation (hereinafter called "transferor") transfers substantially all its property to another corporation formed to acquire such property (hereinafter called "transferee"), if—

(A) the sole consideration for the transfer of such property is the transfer to the transferor or its shareholders of all the stock of all classes (except qualifying shares) of the transferee. \* \* \*

(B) the basis of the property, in the hands of the transferee, for the purposes of this subsection, is determined by reference to the basis of the property in the hands of the transferor;

(C) the transferor is forthwith completely liquidated in pursuance of the plan under which the acquisition of the property is made; and

(D) immediately after the liquidation the shareholders of the transferor own all such stock; \* \* \*

As pointed out in *Gage Brothers & Co.*, 13 T. C. 472, the committee reports accompanying the enactment of section 718 explained that only *under certain very limited circumstances* could its benefits be claimed, and then *only if* the requirements of the section are fully met. Accordingly, petitioner must be held to strict compliance with the section before it can claim its benefits.

On this record, we cannot find proof that the section's requirements were met. In the first place, section 718 (c) (5) (A) requires the *sole* consideration for the transfer of the property to be the transfer to the transferor or its shareholders of all the stock of the transferee. Petitioner, on brief, asserts that this was so, but we find no facts to sustain this assertion. The mechanics of the merger are not in evidence and we cannot ascertain what consideration passed. Secondly, section 718 (c) (5) (C) requires that the transferor corporation be forthwith completely liquidated in pursuance of the plan under which the acquisition of the property is made. We find no evidence in this record disclosing what the "plan" for acquiring the property was or showing that the transferor was "forthwith completely liquidated." In fact, *none* of the documents relating to the merger and take-over of assets, except a schedule showing a comparative statement of assets were presented at the hearing or made part of the record. We do not know whether or not the transferor has even now been completely liquidated. Next, and more important, it seems to us, is the requirement of section 718 (c) (5), that the property be transferred "to another corporation *formed to acquire such property.*" (Emphasis added.) The stipulated facts are that petitioner is the continuing corporation which resulted from the 1937 merger and that "from the time of its incorporation in 1927 [it] and its predecessor were engaged in the manufacture and sale of specially designed haulage equipment," etc. How then can we say that petitioner was "formed to acquire" the property transferred in the merger? It may have had the power and capacity to acquire the transferred property, but it certainly was not "formed" for that purpose. It had been in existence many years prior to the transfer carrying on the business for which it was formed. We take the view that respondent correctly denied petitioner the benefits of section 718 (a) (7).

### Findings of Fact—Issue No. 3.

Petitioner and its predecessor manufactured and sold its products under licenses granted by Henry Fort Flowers, the inventor of the patented features utilized in such products. Flowers also owned the major portion of petitioner's stock and had owned it for a long period of years.

The minute book for the year 1922 of one of petitioner's predecessors reveals that it was "Resolved that the company shall buy the

right to manufacture Differential cars for the year 1922, from the owners of the patents at the rate of $1,000 per car."

Other than the above resolution, there was nothing further in writing between Flowers and the petitioner relative to the use of patents until 1938.

Throughout its existence, with the exception of 1938 when a "Special royalty" was paid, petitioner, during years when royalties were paid, has paid the same amount per unit in royalties regardless of the amount of its profits.

In 1943 a memorandum of agreement was signed by petitioner and Flowers superseding a similar license agreement executed between the parties in 1938, giving petitioner a nonexclusive right to use the patents. This agreement embodied the practice of prior years whereby the amount per unit remained constant and was paid if petitioner's net profits were such as to make payment possible. The agreement covered 23 patents issued during the years 1926–1937 and contained the following provisions:

As a condition for the rights herein granted, Licensor hereby reserves for himself and Licensee hereby agrees to pay to Licensor the following royalty on Dumping Vehicles manufactured by it:

$2,000.00 per Electric Locomotive, including Larry Cars

$1,000.00 per Railroad Type Dump Car

$200.00 per Mine Car, 100 cu. ft. capacity and larger

$150.00 per Mine Car less than 100 cu. ft. capacity

5% selling price on all Repair Parts and Vehicles for rental use.

$25.00 per ton of capacity on all vehicles not included above.

It is also understood and agreed that if, just prior to the close of any calendar year covered by this agreement, it appears that payment of royalty in accordance with the above schedule shall cause the Licensee to operate without profit for that particular year, the above schedule shall, before the end of the calendar year, be subject to compromise and revision to avoid any undue hardship on the Licensee for that particular year. Any compromise agreement shall affect only the payments for the calendar year in which the compromise is made and to have no effect on the above royalty schedule for the prior or succeeding years covered by this License Agreement.

Other companies manufacturing similar products to petitioner which had patents of their own entered into licensing arrangements with Flowers to use his patents in order to settle prolonged patent litigation and save the expense of further law suits, etc.

The royalty to be paid Flowers by other companies varied from $150 per unit to a maximum of $280 per unit, depending upon the size of the vehicle but, in no event, did the total royalty paid on any dumping car exceed 3 per cent of the delivered selling price of the complete dumping car. The amounts of these royalties were fixed after extended patent litigation and to some extent represented compromise amounts.

The inventions upon which patents were obtained by Flowers, and which were utilized by petitioner in the manufacture and sale of its products (petitioner paying royalties thereon) were valuable to the coal and iron mining industries, effecting substantial economies in operation, as well as permitting operations which were theretofore not possible.

With respect to the railway type dump car, the patented features of the "Differential" type car permitted the cargo to be discharged from either side, and at a greater distance from the tracks than had been theretofore possible, the side dropping partially down and locking to form a chute through which the cargo could be discharged, with the car pivoting upon either side instead of the middle. In addition, the gate mechanism was so constructed as to prevent accidental spillage, which spillage had theretofore been a definite nuisance and expense.

With respect to the mine cars produced by Differential, the patented features permitted much longer cars to be used in the mines than had been theretofore possible, by utilizing an "axless" construction in the wheel assembly which permitted the wheels to act as casters. Such feature permitted these cars to negotiate the sharp mine-tunnel curves at higher speeds and with greater loads than ever before.

Automatic coal-loading machines in the mines, to be utilized to the full extent of their capabilities, required larger capacity coal cars to be positioned near them for loading purposes, in order to minimize the transportation time consumed in pulling a loaded car out of the mine and replacing it with an empty one. The narrow and low ceilinged mine tunnels prohibited the enlargement of such cars in an upward or sideward direction. Elongation was likewise prohibited due to the sharp curves in the tunnels—except through the utilization of the "caster type" improvements which were embodied in the Differential car and which were covered by the patents upon which Differential paid royalties. Consequently, such patented features represented a marked improvement of great value in the coal mining industry.

A dump car using the features covered by the Flowers patents was worth at least $1,000 more to concerns using the car than one without such features. The royalties paid by petititoner during the taxable years were reasonable.

Throughout the years 1922 to 1944, inclusive, petitioner paid a total of $744,360.91 as royalties under the licensing arrangement on patents in the name of Henry Fort Flowers. During the same period petitioner paid out a total of $24,224.18 in dividends, including $1,375.23 on its common stock.

The following is a schedule for the years 1940 through 1944 showing

petitioner's gross sales, claimed royalties paid, net income before taxes, and dividends paid:

| Year | Gross sales | Royalties paid | Net profit before Federal income tax | Dividends paid |
|------|-------------|----------------|--------------------------------------|----------------|
| 1940 | $627,875.61 | $82,696.55 | $1,720.27 | $180.95 |
| 1941 | 901,800.37 | 126,548.00 | 27,162.77 | 180.95 |
| 1942 | 835,319.19 | 89,094.45 | 27,917.80 | 180.95 |
| 1943 | 804,347.31 | 120,000.00 | 56,489.80 | 180.95 |
| 1944 | 700,790.66 | 95,250.00 | 29,493.76 | 180.95 |

The petitioner's and its predecessors' gross income from 1921 to 1944, inclusive, varied on the annual basis from a low of $47,973.53 in 1933 to a high of $901,800.37 in 1941.

In 1943 on gross sales of $804,347.31 petitioner showed a profit, after deduction of direct production costs (including royalties), of $179,454.24.** Such profit would have been even higher except that petitioner sustained a substantial loss on a contract involving a new type of equipment furnished to the Bolivian Government, such loss (before royalties) being $11,877.49.

In 1944 on gross sales of $700,790.66 petitioner showed a profit, after deduction of direct production costs (including royalties) of $186,073.47.**

At the end of 1921, the net worth of petitioner's predecessor was $13,737.96. Petitioner or its predecessor sustained operating losses in the years 1926, 1931, 1932, and 1934–1936, inclusive, during none of which years did it pay any royalties. At the end of 1944 petitioner's net worth amounted to $109,994.56.

Some of the persons to whom the royalties were paid pursuant to their claimed interests therein were also stockholders in petitioner and their proportionate shares in the royalties bore a proportionate relation to their stockholdings.

### Opinion—Issue No. 3.

The question here is essentially one of fact—whether the disbursements by petitioner were royalty payments and so deductible as "ordinary and necessary expenses" in carrying on business under section 23 (a) (1) (A), or whether, as claimed by respondent, they amounted to a distribution of profits. *W. N. Thornburgh Manufacturing Co.,* 17 B. T. A. 29.

The record owner of the patents for the use of which the payments were made was the major stockholder of petitioner. The amounts involved were paid over to persons most of whom were also stock-

---

**These figures are reconcilable with "Net Profit Before Federal Income Tax" in above table by adding to "direct production costs" items of "unallocated overhead" amounting to $127,739.48 in 1943 and $156,574.71 in 1944.

holders, and there is an arresting disparity over the years between the total royalty payments and total dividends. These facts not only invite, they demand, close scrutiny.

Of course, if the record establishes that the payments were in fact royalty payments and not the distribution of profits petitioner would be entitled to the claimed deductions. *Webb Press Co., Ltd.*, 3 B. T. A. 247; *Thomas Flexible Coupling Co.*, 14 T. C. 802. In deciding this question both the bona fides of the transactions and the reasonableness of the amount of the payments require consideration. *Webb Press Company, Ltd., supra; George La Monte & Son v. Commissioner*, 32 Fed. (2d) 220; *Granberg Equipment, Inc.*, 11 T. C. 704.

We find no reason to doubt the honesty and good faith of the patent licensing agreements. The arrangement had its genesis as early as 1922, very shortly after formation of petitioner's predecessor when the profit pattern was not yet established and in the days when tax saving devices had not assumed their later importance. That the arrangement was not reduced to writing until 1938 is not important. The written agreement of that year and the 1943 memorandum agreement under which the payments here in question were made, closely followed the previous practice of the parties. There was nothing sham about these agreements.

Over the years the schedule of royalty payments remained the same and royalties were computed at a fixed amount per unit manufactured. The arrangement was prospective as contrasted with the plan to pay retroactively, which was involved in *Granberg Equipment, Inc., supra*. The amounts were in no way dependent on the profit picture of petitioner at year end, except that they were not to be made if their payment would cause undue hardship on the licensee. This provision had a legitimate business purpose as suggested by petitioner on brief in that it was designed so as not to kill the goose that laid the golden egg by piling up deficits in bad years. Petitioner, after all, was in heavy industry and subject to the violent cyclical fluctuations of such industry.

In cases like this when the principal stockholders of a corporation are also holders of interests in the patents and receive the royalty payments, it is easy to say that the transactions were not at arm's length and thus clothe the situation with an aura of suspicion. But we cannot decide cases on suspicion Transactions of like character are not uncommon in the corporate world. See *George La Monte & Son v. Commissioner, supra*, page 221.

We have found that the patented devices utilized by petitioner were valuable to the industries which purchased petitioner's products, in effecting substantial economies in operation as well as permitting operations therefore not possible. In the circumstances, we think

petitioner was justified in paying for the use of the patents so utilized as an expense of carrying on its business.

The question then is, whether the amounts paid were reasonable. On this point we attach weight to the testimony of a witness with broad experience over a 25-year period in the mining industry which utilized petitioner's equipment, that a dump car using the patented features would be worth at least $1,000 more than a car without such features. This figure tallies with the royalty schedule contained in the licensing agreement. We think the fees paid were reasonable.

Respondent makes much of the comparison between the amounts of the royalty payments and the dividend payments made by petitioner. The former were large, the latter small. But that alone does not determine the reasonableness or legitimacy of the royalties. Despite their dollar amount the royalties did not syphon off all profits, nor do we find any design to do so. As pointed out before, the royalty per unit was fixed long before the tax years in question and had no relation to the profits petitioner might make. As a matter of fact, petitioner in 1943 had a profit of $179,454.24 on gross sales of $804,-347.31 after deduction of direct production costs including royalties and in 1944 a profit of $186,073.47 on gross sales of $700,790.66 after similar deductions. Also, as petitioner emphasizes, its net worth increased from $13,737.96 in 1921 to $109,994.56 in 1944 despite operating losses in the years 1926, 1931, 1932, and 1934–1936, inclusive.

We conclude that respondent erred in disallowing as deductions from gross income the amounts of $120,000 and $95,250 paid as royalties for the calendar years 1943 and 1944, respectively.

*Decision will be entered under Rule 50.*