Differential Steel Car Company, et al. [1] v. Commissioner. Differential Steel Car Co. v. Commissioner
Docket Nos. 1775-62, 2217-63, 2394-64, 1792-62, 2216-63, 2395-64.
United States Tax Court
T.C. Memo 1966-65; 1966 Tax Ct. Memo LEXIS 217; 25 T.C.M. (CCH) 344; T.C.M. (RIA) 66065; March 28, 1966
G. C. Scharfy and Robert B. Gosline, for the petitioners. John P. Graham and Clarence C. Roby, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income taxes of petitioners as follows: Docket
Petitioners
No.
Year
Deficiency
Differential Steel Car Company
1775-62
1958
$234,851.53
2217-63
1959
42,856.17
2394-64
1960
30,335.92
H. Fort Flowers and Sara N. Flowers
1792-62
1958
267,191.25
2216-63
1959
43,336.37
2395-64
1960
32,371.70 By amended answers the respondent claimed the following increased deficiencies: Docket
Petitioners
No.
Year
Deficiency
Differential Steel Car Company
1775-62
1958
$315,874.30
2217-63
1959
123,213.76
H. Fort Flowers and Sara N. Flowers
1792-62
1958
392,899.03
2216-63
1959
148,367.68
*218 During 1958, 1959, and 1960 H. Fort Flowers and Sara N. Flowers received payments from Differential Steel Car Company for certain patents which they had sold to it. Only one issue is raised by the pleadings: Were the patent payments made by Differential Steel Car Company to the Flowers reasonable in amount, and thus deductible by the corporation as ordinary and necessary business expenses and taxable to the Flowers as long-term capital gains? Findings of Fact Some of the facts have been stipulated by the parties and are hereby found accordingly. H. Fort Flowers and Sara N. Flowers are husband and wife. They reside at 3023 Del Monte Drive, Houston, Texas. They filed their joint Federal income tax returns for the calendar years 1958, 1959, and 1960 with the district director of internal revenue, Austin, Texas. Differential Steel Car Company is an Ohio corporation with its principal office and place of business at Differential Avenue, Findlay, Ohio. The corporation filed its Federal income tax returns for the years 1958, 1959, and 1960 with the district director of internal revenue, Cleveland, Ohio. H. Fort Flowers (hereafter sometimes called Flowers) graduated in 1912 from *219 Vanderbilt University with a degree in mechanical engineering. His entire professional career since that time has been devoted to the development of specially designed haulage and dumping equipment for iron and coal mines, railroads, quarries, steel mills, and the like. This includes electric locomotives, railroad type dump cars, mine cars suitable for hauling various types of ores and coal, mine passenger cars (often referred to as "man-trip" cars), rotary car dumpers, and an extensive line of repair parts. In the course of his work Flowers has brought new techniques and innovations to the industry. Many of these have been patented. During the years in issue the following patents were issued and outstanding in Flowers' name: Patent
Date
Equipment
Patented Device
No. [2]
Issued
Elec. Locomotive
Drive Mechanism
2,273,256
2-17-42
Man-Trip Car
2,501,503
3-31-50
Rotary Dumper
2,575,869
11-20-51
Mine Car
Stops & Tie Bars
2,633,089
3-31-53
Mine Car
Channel Beams
2,699,733
1-18-55
Air Dump Car
Door Opening Mechanism
2,826,999
3-18-58
*220 Mine cars are used in tunnels to haul materials to the surface. They are approximately 3 1/2 to 4 feet high, 6 1/2 feet wide and 23 feet long, with a load capacity of 8 to 20 tons. Their size is limited by the conditions at the mine site, especially in coal mines, since the seam of coal which lies between rock strata is only a few feet high. Mine cars are pulled by locomotives over rail tracks which are uneven, often causing the cars to derail. Consequently, mine cars are designed for maximum capacity in a unit small enough to travel in restricted spaces and stable enough to negotiate uneven track and sharp curves at relatively high speeds without derailing. Flowers invented and patented an "axless" type mine car in 1937 which was a substantial improvement over those then in use. It permitted the negotiation of sharp curves at higher speeds and with greater loads than had been possible previously. This patent, No. 2,078,915, expired on April 27, 1954. After the first axless cars had been in use for a number of years, it was discovered that the king posts (which connect the wheels to the body) bent out of line, causing the wheels to fall off the track and thus derail the car. When *221 a car derails, the wheels turn at right angles to the body causing extensive damage to tracks and ties. This makes rerailment very difficult and slows down production. In experimenting with solutions for the derailment problem, Flowers invented and patented the devices covered by patent numbers -733 and -089. The -733 patent covers the attachment of a continuous U-shaped supporting beam across the bottom of each car which surrounds and supports the two king posts leading down to the wheels. The support thus provided prevents the king posts from bending out of line and strengthens the body of the car itself. The -089 patent covers two other additions to the mine car, i.e., "stops" and "tie bars." Stops are pieces of metal welded to the bottom of the car in such a way as to limit the are in which the wheels may turn. Tie bars are metal strips connecting the parallel sets of wheels on each end of the mine car. They equalize and adjust the sideways force exerted on the wheels as the car negotiates a curve. The features covered by the -089 patent and the -733 patent reduce the possibility of derailments and minimize damage to the tracks and ties when derailments do occur. Air dump cars *222 are large vehicles of 50 to 100 ton capacity used to transport mineral ore and other materials. They discharge their contents through down swinging doors which are activated when the body of the car is titled to either side by a compressed air system housed in cylinders under the body. Down swinging doors are desirable because they permit the discharging of cargo at a greater distance from the tracks. Accidental spillage during the unloading process has long been a problem to the users of dumping cars. To correct this, Flowers invented and patented the -999 improvement which he included in his dumping cars. [3] By means of this invention, telescoping control arms were placed under the floor of the car and balanced so that when the body tilts to either side, the door on the down side opens at a controlled rate to allow discharge without upsetting the vehicle, while the door on the opposite side is positively locked in the closed position to prevent spillage. The control arms require only half as many parts as did earlier door opening mechanisms. This helps to reduce production and maintenance costs. Air dump cars which incorporate the features of the -999 patent are more reliable, *223 stronger, and longer lasting than other systems performing the same function. Use of the -999 patent in dumping cars guarantees the positive locking of the upper door when in a tilting position which in turn permits the car to be built shorter but with the same load capacity. Generally, inclusion of this patented feature produces a dump car of better performance. To manufacture and sell these products, Flowers formed a corporation in 1922 (hereafter called Steel Car) which he used through 1926. On January 7, 1927, the petitioner, Differential Steel Car Company, was incorporated under the name Differential Car Manufacturing Corporation. It became the production entity and Steel Car the sales entity. This arrangement was continued until December 30, 1937, when Steel Car was merged into petitioner and the latter's name was changed to Differential Steel Car Company. From that time until December 1954 the manufacturing and sales functions were conducted by this single *224 corporation. On December 20, 1954, the manufacturing activities were again transferred to a separate company called Differential Corporation. During the years in issue Differential Steel Car Company was engaged in selling the products made by Differential Corporation. To reflect this division and to avoid confusion in referring to each, the petitioner, Differential Steel Car Company, will hereafter be called Sales and the Differential Corporation will be called Manufacturing. The stock of Manufacturing was issued share for share to the stockholders of Sales when Manufacturing was created. On December 20, 1954, Sales transferred to Manufacturing the physical assets pertaining to the manufacturing activities previously carried on by Sales, plus certain cash and liquid assets subject to certain accounts payable. Sales received all the stock of Manufacturing which was distributed directly to the shareholders of Sales. At the same time, Sales entered into a written contract with Manufacturing whereby the latter agreed to manufacture the products previously made by Sales. Payment by Sales to Manufacturing was provided for in this contract as follows: The price of equipment purchased *225 by Differential Steel Car Company under this agreement will be determined by the selling price of Differential Steel Car Company to its customers. The price to be the selling price of the Differential Steel Car Company to its customers less 25%. This 25% is to be subject to adjustment for unusual circumstances for a reasonable time after the equipment has been manufactured and shipped. Duty tax and freight ought not to be considered a part of the selling price. From time to time Sales and Manufacturing agreed in writing to change the amount paid by Sales to Manufacturing as follows: Percentage of
Date of
Selling Price
Effective for
Change
to be Paid
Calendar Year
10-28-58
70%
1958
1- 8-59
70%
1959
12- 1-60
82 1/2%
1960
12- 4-61
80%
1961
12-21-62
82 1/2%
1962
During the years in issue the stockholders and directors (and the offices they held) of Sales and Manufacturing were as follows: Stockholders
Directors
Office
H. Fort Flowers
H. Fort Flowers
Chairman of the Board
Shelly G. Hughes
Shelly G. Hughes
President
Hugh H. Houck
Hugh H. Houck
Vice President
H. Fort Flowers Foundation, Inc.
E. M. Blackford
Vice President and Secretary-Treas-
Urer
Daniel F. Flowers [4]
Vice President and Assistant Secretary
Fred F. Flowers
Vice President
*226 Daniel F. and Fred F. Flowers are sons of H. Fort Flowers. Blackford, Hughes, and Houck were longtime employees. Hughes, for example, first met Flowers when they were students together at Vanderbilt, and he has worked continuously for Flowers since December 1916. The H. Fort Flowers Foundation, Inc. (hereafter called Foundation) is a nonprofit corporation organized on December 18, 1951, exclusively for educational, charitable, religious, scientific, or literary purposes. The Foundation is recognized by the Internal Revenue Service to be tax exempt and contributions thereto are deductible for income tax purposes. The Foundation has had the following trustees and officers since its inception: Period
Name
Position
From
To
H. Fort Flowers
Trustee and President
12-20-51
Present
Shelly G. Hughes
Trustee and Vice Pres.
12-20-51
Present
Emerson M. Blackford
Trustee and Secretary
12-20-51
Present
Sara Niles Flowers
Trustee
12-20-51
Present
Daniel F. Flowers
Trustee
12-20-51
Present
Treasurer
12-20-51
Present
Asst. Secretary
4- 2-56
Present
Vice President
4- 2-56
6- 1-59
Vice President
6- 7-63
Present
Hugh H. Houck
Trustee
12-20-51
4-20-61
Fred F. Flowers
Trustee
4- 2-56
8-21-58
Joseph W. Mantooth
Trustee
10-25-62
Present
Marteal H. Holcomb
Asst. Secretary
8-12-57
2-25-58
Nina Murrin
Asst. Secretary
2-25-58
Present
*227 All of the trustees except Sara Flowers were employees of Sales or Manufacturing. Immediately prior to Manufacturing's incorporation on December 17, 1954, the stock of Sales was held as follows: Owner
Shares
H. Fort Flowers
1,300
Shelly G. Hughes
70
Hugh H. Houck
17 1/2
H. Fort Flowers Foundation, Inc.
240
On December 22, 1954, the stock record book of Sales reflects a transfer of 730 shares of stock from Flowers to Hughes. On August 21, 1958, the stock record book of Sales reflects another transfer of 164 shares from Flowers to Houck. In both cases Flowers and the buyer executed sales agreements providing for a price of $100 per share for the shares (or in lieu thereof some subsequently to be adjusted price). Flowers then loaned the necessary purchase price by check and the buyer immediately returned the same amount by check to Flowers. Flowers then took a noninterest bearing demand note on the same date. By its terms Flowers retained possession of the shares as collateral security. Calls were also executed by Flowers and the buyers which provided that Flowers or his estate could reacquire the shares at the same price at which they were sold (or the subsequently *228 adjusted price, if any). Finally, assignments of the shares were executed by the buyers to Flowers. Houck was injured in an automobile accident on the night of April 19, 1961, and died early the following morning before working hours. After Houck's death, Flowers wrote "cancelled April 20, 1961" across the note and "called April 20, 1961" across the face of the assignment. Flowers then instructed Hughes to transfer this stock on the books of the corporation to Hughes as from Houck. Since December 31, 1948, undivided interests in the patents issued to Flowers have been owned as follows: Flowers
78%
Sara N. Flowers
20%
Daniel F. Flowers
1%
Fred F. Flowers
1% For convenience, these persons, when referred to hereafter as a group, shall be called the "sellers." At various times the sellers have sold various patents owned by them to Sales. None of these sales has ever been recorded with the United States Patent Office. Each agreement contains the following paragraphs with respect to the consideration received by both parties: 1. First Parties have granted, bargained, sold, conveyed, transferred, assigned, setover and delivered, and by these presents do grant, *229 bargain, sell, convey, transfer, assign, set-over and deliver unto Second Party all their right, title and interest in and to United States Patent No. * * * issued under date of * * * to Henry Fort Flowers for improvements in and to [name of device or equipment], and to make, sell, and use same, said patent being now recorded in the name of Henry Fort Flowers on the records of the United States Patent Office at Washington, D.C.; and the First Parties agree that they will execute all further instruments and will do any and all other or further acts which may be required by Second Party, or any assignee of Second Party, for the full and complete transfer of all the right, title and interest of First Parties in said Letters Patent and the invention subject thereof. 2. Second Party agrees to pay First Parties in consideration of their entire interests in said Letters Patent sold, assigned, and transferred hereunder, on * * *, and each year thereafter, until the end of the life of this patent a sum of money equal to * * * [percent] of the net profits of said [name of device or equipment] sold during the respective year. The following schedule lists the sales made by the sellers *230 to Sales under the above agreements: Sales Price
Equipment
Patent
Date
(% of Net
or Device
No.
of Sale
Profit)
Drive Mechanism
-256
1- 3-49
50
Man-trip Car
[5] -503
1- 3-49
50
Rotary Dumper
[6] -869
1- 3-49
50
Stops & Tie Bars
-089
1- 2-54
50
Channel Beams
-733
1- 2-56
80
Man-trip Car
-503
1- 2-58
80
Rotary Dumper
-869
1- 2-58
80
Door Opening
Mechanism
-999
5-22-58
80
From 1937 through 1947 Sales manufactured and sold mining equipment similar in nature to that described above by using certain earlier patents issued to Flowers. The agreements by which Sales and its predecessor corporation obtained the use of these patents provided for a flat royalty payment for each one of the products manufactured and sold, as shown below: $2,000
per electric locomotive
1,000
per railroad type dump car
200
per mine car, 100 cubic foot capacity and
larger
150
per mine car, less than 100 cubic foot ca-
pacity
5%
selling price on all repair parts, and vehi-
cles for rental use $25
per ton of capacity on all vehicles except
as stated above
*231 The agreements provided that if, in any year, the payment of royalties would cause the corporation to operate without profit, the royalties for that particular year were subject to revision in order to avoid undue hardship on the corporation. No royalties were charged in 1926, 1931, 1932, and 1934-1936, inclusive. On April 1, 1949, respondent issued a notice of deficiency to Sales disallowing as a deduction from gross income the entire amount of royalties paid Flowers for the calendar years 1943 and 1944. Sales filed a petition in this Court challenging the respondent's determination and on February 23, 1951, we filed Findings of Fact and Opinion (16 T.C. 413) holding that such payments were reasonable and deductible in full by Sales. The patents involved in that case are not in issue in this proceeding and the patents here involved were not in issue in the prior case. At the time of the sales of the -256, -503, and -869 patents in January 1949 the issue of reasonableness of the royalty payments for 1943 and 1944 was in dispute. Subsequent to these sales in January 1949, but before the promulgation of our opinion in 16 T.C. 413 with respect to the tax years *232 1943 and 1944, the respondent issued Mim. 6490 (1950-1 C.B. 9) in which he announced his position that patent sales agreements which provided for payment to be measured by production, sale, or use were to be treated for income tax purposes as royalty agreements, taxable as ordinary income rather than capital gain. On June 4, 1957, respondent issued a notice of deficiency to Flowers and his wife determining deficiencies in Federal income taxes for the calendar years 1951, 1952, and 1953 on the grounds that the entire payments received by them from Sales in those years under the agreements of January 3, 1949, were ordinary income rather than long-term capital gain. The Flowers then filed a petition with this Court (Docket No. 69471)and on January 5, 1959, respondent stipulated that there were no deficiencies due for those years and that there were overpayments for the calendar years 1951 and 1952. In a letter dated November 11, 1957, Flowers offered to resell patents -869 and -503 to Sales for 30 percent more profit than the agreement dated January 3, 1949, by which Flowers had already transferred all his right, title, and interest therein. The letter offer reads as *233 follows: On January 3rd, 1949, I sold several patents (including the undivided interests owned by others) to Differential Steel Car Company. Since then I have been awarded new patents that are an improvement over the older patents and more valuable. It is obviously to DSCCo's advantage to own these patents rather than to just take a license to manufacture under them. When I give up title to a patent I should receive more payment than when I grant a license for its use. On March 1st, 1951, The Tax Court of the United States, at Cleveland, Ohio, Docket No. 23909 held that the patent royalties paid by DSCCo in 1943 to the then licensees was reasonable. The royalty for 1943 was $120,000.00, which amounted to 69% of the profit (before income tax) on said patented articles sold during the year 1943. For the six years 1943 thru 1948 The Commissioner allowed an average of 77% of profits to be paid to the patent licensees. For the years 1947 and 1948 The Commissioner allowed an average of 86% of the profit to be paid to the patent licensees. The royalties paid by DSCCo for the exclusive use of the patents was $235,250.00. Under the 1939 law in effect during 1947 and 1948, the exclusive *234 license fees amounted to a sales price for the patents. That was particularly true because the patents were assigned to DSCCo. at the end of that period. Had the owners of the patents only known that they were entitled to Capital Gains treatment on the 1947 and 1948 patent fees they would have saved more than $100,000.00 Federal Income Tax. Actually the licensee car manufacturers other than DSCCo. quit paying royalties on November 28, 1941. So had the patent owners known their legal tax rights they would have claimed Capital Gains on $679,536.00 royalties collected from DSCCo. for years 1942 thru 1948 inclusive. That would have saved the patent owners more than $300,000.00. Now the owners of patents Nos. 2,826,999., [7] 2,575,869., 2,501,503., and 2,699,733 [8] offer to sell said new patents to Differential Steel Car Company for 80% of the net profits on the patented articles manufactured and sold during each respective year beginning January 2nd, 1958, payable December 31, 1958 and each year thereafter for the life of the respective patents. *235 Please advise by December 15, 1957 whether Differential Steel Car Company accepts this offer. On November 25, 1957, Sales board of directors accepted Flowers' offer. The minutes of that meeting in part are as follows: Mr. Hughes exhibited a letter he received from Mr. H. Fort Flowers offering to sell some patents. Mr. Hughes stated that the company needed these patents as some of the older patents were about to expire and that the life of others was extremely short. The terms of payment to be 80% of the net profits on the patented articles manufactured and sold during each respective year beginning January 2, 1958 payable December 31, 1958, and each year thereafter for the life of the respective patents. This percentage would be closely in line with the royalty paid prior to 1949. In addition ownership of the patents would be more of an advantage than licenses for their use. Mr. Hughes further stated that ownership of patents and the protection they offered was vital to the welfare of the company and he recommended that the offered patents be purchased. Mr. Hughes offered the following resolution which was seconded by Mr. Houck and adapted: BE IT RESOLVED, That Mr. Shelly *236 G. Hughes sign, as President of Differential Steel Car Company, purchase contracts for the following patents: No. 2,826,999, No. 2,575,869, No. 2,501,503, No. 2,699,733 There being no further business, the meeting was then adjourned. On January 2, 1958, the sellers entered into written agreements with Sales with respect to patents -503 and -869. These agreements differed from the agreements dated January 3, 1949, only to the extent that they stated the patent numbers rather than the patent application numbers, the new dates rather than the former dates, and a figure of 80 percent of net profits rather than the previous figure of 50 percent of net profits. The -256 patent expired February 17, 1959. The January 3, 1949, sales contract transferring title in the -256 patent to Sales contained no provision requiring or providing for the continuation of patent payments after the expiration date but Sales nevertheless continued to make payments on this patent throughout the remainder of 1959, 1960, 1961, and 1962. The following schedule sets forth the sales for the years 1958, 1959, and 1960 made by Sales of equipment employing one or more of Flowers' patented devices: Year
Locomotive
Man-Trip
Rotary
Mine Car
Air Dump
-256
-503
Dumper-869
-089 & -733
Car-999
1958
$25,786.02
$18,451.59
$19,592.89
$ 851,616.26
$3,477,033.09
1959
22,310.76
3,371.11
15,813.00
554,968.56
1,097,741.08
1960
31,355.96
4,393.48
3,081.44
244,380.90
925,030.74
Totals
$79,452.74
$26,216.18
$38,487.33
$1,650,965.72
$5,499,804.91
*237 In the 23-year period from 1940 through 1962, sales involving patented items amount to 99.2 percent of total sales, and in 11 of those years all sales involved patented items. For the calendar years 1940 through 1962, Sales reported on its Federal income tax returns total sales, net income before royalty payments, royalty payments, and net income before Federal income taxes as follows: Net income before
Calendar
Net income be-
Federal in-
year
Total sales
fore royalties
Royalties
come tax
1940
$ 627,875.61
$ 84,416.82
$ 82,696.55
$ 1,720.27
1941
901,800.37
153,710.77
126,548.00
27,162.77
1942
835,319.19
117,012.25
89,094.45
27,917.80
1943
804,347.31
176,489.80
120,000.00
56,489.80
1944
700,790.66
124,748.76
95,250.00
29,498.76
1945
711,855.96
92,424.98
72,275.00
20,149.98
1946
801,063.98
131,268.75
89,950.00
41,318.75
1947
671,889.49
81,483.61
65,182.65
16,300.96
1948
1,631,550.17
192,177.90
173,068.88
19,109.02
1949
1,652,747.32
280,763.98
140,846.03
139,917.95
1950
1,199,841.02
317,452.90
149,200.17
168,252.73
1951
1,244,330.76
273,665.14
114,499.09
159,166.05
1952
1,550,487.33
305,642.10
147,649.34
157,992.76
1953
2,176,413.90
565,691.96
288,932.38
276,759.58
1954
2,218,465.74
801,597.49
397,867.85
403,729.64
1955
1,712,506.08
348,649.83
177,037.42
171,612.41
1956
2,283,566.09
473,937.11
348,007.99
125,929.12
1957
4,529,191.63
993,748.10
656,822.41
336,925.69
1958
4,448,496.74
1,212,089.21
1,110,103.73
101,985.48
1959
1,694,204.51
428,689.16
339,014.30
89,674.86
1960
1,118,706.67
108,040.60
78,408.50
29,632.10
1961
1,772,618.82
268,352.72
250,748.20
17,604.52
1962
1,407,553.51
160,837.00
141,412.85
19,424.15
*238 Sales' predecessor corporation had a net worth at the end of 1921 of $13,737.96. The net worth of Sales grew to $109,994.56 in 1944 and to $371,700.92 by the end of 1960. Manufacturing's net worth at the end of 1960 was $1,190,518.60, adjusted to absorb operating losses of $365,509.34 arising from unrelated oil and gas operations in Texas. During the years 1940 through 1962 Sales and Manufacturing paid the following dividends: Sales
Year
Amount
12-24-40
$ 180.95
12-20-41
180.95
12-28-42
180.95
12-15-43
180.95
12-15-44
180.95
12-15-45
180.95
12-14-46
176.75
12-23-47
176.75
12-28-48
176.75
12-28-49
176.75
12-27-50
176.75
12-22-51
325.50
12-15-52
325.50
12-15-53
325.50
12-23-54
325.50
12-23-55
325.50
12-21-56
325.50
12-23-57
16,275.00
12-23-58
16,275.00
12-21-59
162.75
12-31-60
162.75
12-20-61
162.75
12-20-62
162.75
Manufacturing
12-23-54
$ 162.75
12-23-55
162.75
12-17-56
162.75
12-23-57
1,627.50
12-23-58
1,627.50
12-24-59
162.75
12-24-60
162.75
12-22-61
162.75
12-21-62
162.75
For the calendar years 1949 through 1954 the net profit on which the patent payments to the sellers were computed was *239 that of Sales alone. For the calendar years 1956 through 1962, the patent payments to the sellers were based upon the sales of Differential Sales and the combined costs of Sales and Manufacturing, exclusive of intercorporate purchase of equipment and repair items. For the calendar years 1949 through 1962, Sales accrued and paid to the sellers patent payments as shown in the above schedule and claimed deductions therefor in its Federal income tax returns filed for such years as depreciation on the patents then owned by it. For the calendar years 1949 through 1962, the Flowers reported as long-term capital gain in their joint Federal income tax returns filed for such years 98 percent of such amount (representing their undivided interest of 78 percent and 20 percent, respectively) minus the sum of $1,420 representing cost recovery. Opinion The sole issue, entirely one of fact, presented for our decision is whether the payments made by the Differential Steel Car Company to the Flowers for their patents were reasonable. Respondent claims that, to a large extent, they are not. Consequently, he has determined that the amounts deemed by him to be unreasonable are not deductible by the *240 corporation as ordinary and necessary business expenses, and are not includable by the Flowers as proceeds from the sales of capital assets under section 1235, Internal Revenue Code of 1954. [9] Petitioners counter with the argument that these payments are reasonable because they flow from bargained-for sales agreements representing the arm's-length negotiations of independent parties. Payments by a corporation to its controlling stockholder for the purchase of a patent or process originally owned by him are deductible as a business expense *241 if the amount paid is reasonable, which of course depends to a considerable degree on the value of the invention or process and its salability in the open market. See Stearns Magnetic Mfg. Co. v. Commissioner, 208 F. 2d 849 (C.A. 7, 1954); Ingle Coal Corporation v. United States, 127 F. Supp. 573 (Ct. Cls., 1955). An agreement between a corporation and its controlling stockholders is valid and enforceable if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. Stearns Magnetic Mfg. Co. v. Commissioner, supra; Roy J. Champayne, 26 T.C. 634 (1956); Differential Steel Car Co., 16 T.C. 413 (1951); Heatbath Corporation, 14 T.C. 332 (1950); Wall Products, Inc., 11 T.C. 51 (1948); Webb Press Co., Ltd., 3 B.T.A. 247 (1925). The fact that the petitioners were dealing with each other does not, standing alone, condemn the transactions and agreements involved as shams. But, on the other hand, transactions between related parties do invite close scrutiny. Differential Steel Car Co., supra.Certainly the *242 circumstances pertaining to the execution of the agreements, as well as the reasonableness of the amounts required to be paid, must be carefully considered in reaching a decision as to whether the payments were in fact bona fide or simply disguised distributions of corporate profits. Granberg Equipment Inc., 11 T.C. 704 (1948); W. N. Thornburgh Manufacturing Co., 17 B.T.A. 29 (1929). Although the stock record book of the petitioner corporation shows that H. Fort Flowers owned less than 25 percent of its stock, we are convinced by the evidence adduced at the trial that, for all practical purposes, Flowers was actually dealing with himself when he and his family sold the patents to Sales. In reality he controlled the corporation, not by outright ownership of a majority of its stock but through his close relationship and domination of its principal owners, directors, and officers. Hughes has been a life-long associate of Flowers and has looked to him for employment since 1916. Houck and Blackford were employees of Manufacturing, a corporation in which 80 percent of the stock is directly owned by Flowers. During the years before us these three men and members *243 of the Flowers family comprised the Foundation's entire board of trustees. This relationship between H. Fort Flowers and the remaining principals of Sales is not the only evidence tending to refute petitioner's contentions as to the independence of the parties. The very nature of the stock transfers to Houck and Hughes[10] raise serious questions as to whether Flowers ever actually divested himself of control. Hughes and Houck had little, if any, equity in the stock after the purchases. Flowers retained complete authority and control over the stock. Moreover, he exercised his control immediately after Houck's death by directing the transfer of Houck's shares to Hughes. We cannot help but view these transfers with suspicion. Indeed, we are persuaded by these transactions and other evidence in this record that H. Fort Flowers controlled virtually every major phase of corporate activity and made the key management decisions. *244 Control alone, however, does not make the patent payments unreasonable. The agreements under which they were paid will still be given effect "if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length." Stearns Magnetic Mfg. Co. v. Commissioner, supra, at p. 852. Here we think all the indicia of arm's-length dealing are missing. These contracts were to cost Sales 80 percent of its net profits yet Sales made no effort to check shop rights, the ease of avoidance, or the validity of the patents. Hughes, in his capacity as president of the company, sought no legal advice; was not aware of the scope of the particular patents; and did not consider the possibility of avoidance by competitors or invalidity. Finally, he did not attempt to make any counteroffer or disagree with the demands of Flowers. He simply did what he was told to do. To be sure, it is unlikely that any reasonably prudent purchaser under these circumstances would have ignored such vital factors before committing itself to pay an amount measured by 80 percent of its net profits. Furthermore, the assignments of the patents were never *245 recorded with the United States Patent Office. Failure to do so made it possible for the sellers to resell and then record the same patents, completely divesting Sales of its title. See 35 U.S.C.A. 261. Significant, too, are the sales agreements dated January 2, 1958. Basic to the notion of arm's-length negotiation is the assumption that the written agreements which arise from it mean what they say. On January 2, 1949, the sellers conveyed "all their right, title and interest in and to" the -503 and -869 patents for 50 percent of the net profits realized by Sales on equipment using the patents. For the next 7 years Sales quite successfully operated under this agreement. On November 11, 1957, Flowers offered to resell the same patents to Sales for 80 percent of such net profits. Thus, on January 2, 1958, Sales "repurchased" the patents at the price requested by Flowers. The net effect of this agreement was that the sellers thereafter received an additional 30 percent of Sales' net profits for the use of patents it already owned and Sales received nothing in the way of new consideration. Because of the 1949 agreements we give no effect to the "second sale" of *246 them on January 2, 1958. Flowers' letter of November 11, 1957, also offered the -733 and -999 patents for sale at the 80 percent price. On November 25, 1957, Sales' board of directors authorized their purchase even though the corporation had supposedly purchased the -733 patent at the 80 percent figure in an agreement dated January 2, 1956. The petitioner contends that the 1956 agreement was really entered into at that time, but that payments thereunder were set at 50 percent during 1956 and 1957 because of the uncertainty caused by respondent's unfavorable ruling (Mim. 6490) and his challenge of the Flowers' tax returns for 1951, 1952, and 1953. These two actions by the respondent, however, were concerned with the nature of the payments (ordinary income vs. capital gain) and not their reasonableness, and we see no connection between them and the contention that it had intended to pay the Flowers 80 percent of net profits all along. Because of the blatant inconsistency between the date of the sales agreement of the -733 patent and its "renegotiation" by Flowers and the board of directors almost two years later, we give no weight to the January 2, 1956, agreement. Moreover, the *247 letter and the resolution mention the -999 patent by number over four months before it was actually issued. This is still another example of the lack of consistency to be found in the documents purporting to increase the payments for the patents in issue to 80 percent of net profits. Because of the failure to adequately explain these obvious inconsistencies, we give no effect to these sales agreements as proof that Sales and Flowers dealt at arm's-length. We conclude that Sales bought not what it needed, but what Flowers wanted to sell. The prices were not set by arm's-length bargaining, but by what Flowers hoped would escape taxation as ordinary income. In short, the agreements providing for the payment of 80 percent of net profits do not pass muster; we view them as mere attempts to escalate the drain of additional corporate profits into the hands of the Flowers family at capital gains rates. Having concluded that these sales agreements were not the products of arm's-length dealing between the parties, we must make our own determination as to what the value of these patents would be under conditions of arm's-length bargaining. Respondent vigorously urges us to find that the patents *248 themselves are invalid, predicating his contention on allegations of the public use to which they were put by Sales before the patents were actually issued. In addition, he maintains that the corporation acquired shop rights in the patents because they were developed by corporate employees on corporate time using corporate facilities and tested on corporate customers. It may well be that these factors of prior public use and shop rights would result in a determination that the patents were not valid if this were a direct action challenging the validity of the patents themselves, viz., an infringement suit. But this argument, directed as it is to the question of whether these patents were validly issued in the first place, constitutes a collateral attack which must fall under the presumptive validity accruing to the patents. As this Court has said before, "collateral attack may not be made in this proceeding upon the actions of the Patent Office in the issuance of the patents," Joseph H. Adams, 23 B.T.A. 71 (1931), affd. 65 F. 2d 262 (C.A. 5, 1933), certiorari denied 290 U.S. 660 (1933); see also United States v. Bell Telephone Co., 167 U.S. 224 (1896). *249 In his reply brief the respondent argues that the Adams decision was nullified by the admitted dicta contained in United States v. Gypsum Co., 333 U.S. 364, 386 (1947). [11] Recognizing that the issue "need not be decided to dispose of this case," the majority opinion of the Supreme Court stated at pages 387-388: In an antitrust suit instituted by a licensee against his licensor we have repeatedly held that the licensee may attack the validity of the patent under which he was licensed, because of the public interest in free competition, even though the licensee has agreed in his license not to do so. Sola Electric Co. v. Jefferson Electric Co. 317 U.S. 173; Katzinger Co. v. Chicago Mfg. Co., 329 U.S. 394; MacGregor v. Westinghouse Co., 329 U.S. 402. In a suit to vindicate the public interest by enjoining violations of the Sherman Act, the United States should have the same opportunity to show that the asserted shield of patentability does not exist. Of course, this appeal must be considered on a record that assumes the validity of all the patents involved.
*250 It seems to us that the majority opinion restricts its application to the general area of antitrust law and supports its conclusion by appealing to the necessities of protecting the public interest. [12]
Since no considerations of public interest are involved in this proceeding, we are unwilling to accept respondent's invitation to enter the arena where the statutory presumption of patent validity is being challenged collaterally. To do so would plunge this Court *251 headlong into the consideration of complex and highly technical questions of patent law - an area in which we have little expertise. In our view the Adams decision is directly in point and it requires us to consider these patents as being presumptively valid for Federal tax purposes. We are cognizant of the conflicting evidence presented to us on the reasonableness of these patent payments. A number of the corporate customers have testified, often in a differing manner, on the extent to which the patents played a part in deciding the purchase of mining equipment. Highly skilled experts for both sides voiced their divergent views on the amounts which they feel Sales should reasonably be expected to pay for these patents. We also considered mechanical models of the patents, the official records of their issuance at the Patent Office, and certain photographic proof of their ability to stand hard use. Throughout our examination of the detailed and complex evidence in this record, we have borne in mind that H. Fort Flowers is a leading inventor in the field of mining equipment, having many years of experience in its production and several patents to his credit. Likewise, we have considered *252 the scope and length of the patents involved, their uniqueness and simplicity over earlier products, and the other outstanding patents in the field. Finally, we have weighed heavily the fact that this equipment is sold as a result of competitive bidding rather than on the basis of the patented features themselves; that the market is one of high sales prices and low unit volume; and that the -999, -089, and -733 patents involve relatively minor improvements to already existing equipment covered by earlier and far more basic patents while the -256, -503, and -869 patents cover equipment the sales volumes of which was very small during the years in issue. Taken as a whole, the history of Flowers' inventive practices impresses us as being one of gradual development culminating (particularly with respect to the patents covering the mine cars and air dump car) in the refinement and improvement of relatively small facets of this equipment which produced the great bulk of corporate sales and profits. Thus, we view the -999, -089, and -733 patents as comparatively narrow in scope, producing only improvements in equipment the earlier major patents on which have already generated substantial *253 profits. The three improvement patents affecting the mine car and the air dump car represent only the most recent in a long series of improvements to basic equipment on which the original patents have long since expired. During the years before us the sales of mine cars and air dump cars were not made primarily upon the revolutionary aspects of the -733, -089, and -999 patents, but basically upon the ability of Sales and Manufacturing to provide the least expensive equipment to do the job. Considering all the facts and circumstances, we conclude that 50 percent of Sales' net profits [13] (as they were computed by the petitioners during the years in question) is fair and reasonable for them under conditions of arm's-length negotiations. [14]
*254 Accordingly, to reflect this conclusion, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Differential Steel Car Company, Docket Nos. 2217-63, 2394-64; and H. Fort Flowers and Sara N. Flowers, Docket Nos. 1792-62, 2216-63, and 2395-64.↩
2. Generally only the last three numerals of each identifying number will hereafter be used when referring to these patents.↩
3. The -999 patent is the most recent improvement to this respective vehicle, and superseded patent No. 2,251,993↩ issued to Flowers and used in earlier years by the corporation. This patent expired on August 12, 1957.
4. A director of Sales only.↩
5. Originally sold as a "patent-applied-for" under patent application No. 730,586. Patent No. -503 was issued on this application March 21, 1950. ↩
6. Originally sold as a "patent-applied-for" under patent application No. 682,347. Patent No. -869 was issued on this application November 20, 1951.↩
7. Although the letter was dated November 11, 1957, and was accepted by the board of directors of Sales as reflected in the minutes of their meeting dated November 25, 1957, it does mention by patent number the door opening device patent that was not issued until March 18, 1958, and consequently not sold to Sales until May 22, 1958. ↩
8. The patent bearing this number had already been the subject of a sales agreement for 80 percent of net profit on January 2, 1956, with payments made at 50 percent of net profits in 1956 and 1957 under an agreement by both parties.↩
9. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. - A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred.↩
10. These transfers were obviously designed to reduce Flowers' percentage ownership in Sales within the statutory requirements for capital gains treatment of patent payments. Compare the original 50 percent stock ownership allowance created by section 1235(d) of the Internal Revenue Code as enacted on August 16, 1954, with the present 25 percent stock ownership allowance created by an amendment to section 1235(d)↩ effective September 3, 1958.
11. See the concurring opinion of Justice Frankfurter↩ at page 402.
12. Whatever the reasoning behind this decision, and perhaps because of its narrow application, it has never been cited as authority for the proposition that any collateral attack on a patent can be made. Our research has produced only one citation to this portion of the opinion. It can be found in the dissenting opinion of Chief Judge Stephens of the Circuit Court of Appeals for the District of Columbia in Decker v. Federal Trade Commission, 176 F. 2d 461, 467↩ (1949). Judge Stephens stated that because this portion of the Gypsum opinion is admitted dicta, and restricted to the narrow field of antitrust, it has no value as precedent in cases involving violations determined by the Federal Trade Commission.
13. Using the more ordinary "percentage of gross sales" as a measure for patent payments, 50 percent of net profits here is equivalent to approximately 13.80 percent of gross sales of patented items in 1958, 12.65 percent in 1959, and 4.83 percent in 1960. ↩
14. This result applies to all of the patents involved except -256. In the case of the -256 patent, our determination applies only to sales which occurred before the patent expiration date, February 17, 1959. After that time no patent payments are allowable.↩